| | | | |
|---|---|---|---|
| SAMIA COMPANIES LLC, | ) | | |
| | ) | | |
| Plaintiff, | ) | CIVIL ACTION | |
| v. | ) | NO. 11-12329-NMG | |
| | ) | | |
| MRI SOFTWARE LLC, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTION TO DISMISS

September 4, 2012

DEIN, U.S.M.J.

## I.  INTRODUCTION

This action arises out of a Master License and Services Agreement under which

the plaintiff, Samia Companies LLC ("Samia"), agreed to purchase computer software,

consulting services and technical support services from the defendant, MRI Software

LLC ("MRI"), which was previously known as Intuit Real Estate Solutions ("Intuit").[1]

Samia claims that the defendant failed to provide certain software components that were

promised as part of the parties' agreement, failed to complete the development of certain

work required under the contract, improperly terminated technical support for which

Samia had paid, and sold Samia system components that failed to function properly.  By

---

[1]  In 2009, Intuit Real Estate Solutions was purchased by a private equity firm and
renamed MRI Software LLC. (Def. Mem. (Docket No. 9) at 2 n.1).  Except as indicated herein,
for purposes of this case, there is no relevant distinction between Intuit and MRI.

its Verified Complaint, Samia has asserted claims against MRI for breach of contract (Counts I, III, V, and VIII), misrepresentation (Counts II, IV, VI, and IX), conversion (Count VII), and unfair or deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A (Count X).

The matter is presently before the court on "Defendant MRI Software LLC's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)" (Docket No. 8), by which MRI is seeking the dismissal of all of Samia's claims for failure to state a claim. For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that MRI's motion be ALLOWED IN PART and DENIED IN PART. Specifically, this court recommends that the misrepresentation claims found in Counts IV, VI and IX be dismissed, but that MRI's motion otherwise be denied.

## II. STATEMENT OF FACTS

When ruling on a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), the court must accept as true all well-pleaded facts, and give the plaintiff the benefit of all reasonable inferences. See Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999). "Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001). "There is, however, a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the

complaint.'"  Id. (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).  Applying

this standard to the instant case, the facts relevant to MRI's motion to dismiss are as

follows.

## The Parties' Agreement

The plaintiff, Samia, is a real estate management firm which is responsible for

managing more than 100 properties, including over 2,800 apartment units located

primarily in eastern Massachusetts.  (Compl. ¶ 5).[2]  In June 2009, Samia's CPA, Edward

J. Saab ("Saab"), entered into negotiations with Joseph Stublarec ("Stublarec"), a sales

representative for Intuit, for the purpose of purchasing a new property management

software system for the plaintiff.  (Id. ¶¶ 6-7).

Throughout the course of his discussions with Stublarec, Saab allegedly made it

clear that any software package purchased by Samia had to include a 1099 interest

reporting component for residential tenant deposits (the "1099 Interest Component") that

would be acceptable to the Internal Revenue Service and would produce forms that could

be sent to Samia's tenants.  (See id. ¶ 11).  He also emphasized that the 1099 Interest

Component was the most important software component to Samia, and that the company

was unwilling to purchase any system that did not contain such a Component.  (Id. ¶ 15).

Samia claims that Stublarec acknowledged this requirement, and assured Saab that the

Intuit Real Estate Solutions ("IRES") Program he was proposing to sell to Samia included

_____

[2]  Samia's Verified Complaint is attached as an exhibit to Docket No. 1.

a 1099 Interest Component.  (Id. ¶¶ 12, 16).  In fact, during a demonstration of Intuit software at Samia's offices, Stublarec showed Saab a 1099 component of the software program that calculated the total funds paid to a given vendor, and assured Saab that the 1099 Interest Component for residential tenant deposits would operate in a similar manner.  (Id. ¶ 14).

Allegedly based on Stublarec's representations, Samia decided to purchase the IRES Program from Intuit.  (Id. ¶ 17).  Accordingly, on July 31, 2009, Samia and Intuit entered into a Master License & Services Agreement ("Agreement") under which Samia agreed to purchase the IRES Program, as well as software maintenance services, technical support services and consulting services, from Intuit for a total initial price of $93,337. (Agreement at 2).[3]  As set forth in Schedule A to the Agreement, the software consisted of the following Intuit User Licensed Programs: "Residential Management," "Residential Management Electronic Lockbox," " Facility Management," "Accounts Payable," "General Ledger," "ReportDesign," "WebDesign," "Advanced User Security," "Virtual Site (Includes Distributive Processing)," and "1 SQL Database."  (Id. at Schedule A). However, the Agreement did not specifically describe the contents of those Programs.

### Initial Development of the IRES Program

According to Samia, the process of installing the IRES Program at Samia's offices began in September 2009.  (Compl. ¶ 18).  Karyn Publicover ("Publicover") acted as

---

[3] The parties' Agreement can be found at Exhibit 1 to Samia's Verified Complaint, and at Exhibit A to the defendant's memorandum in support of its motion to dismiss.  (Docket No. 9).

Samia's initial contact person at Intuit for purposes of developing and installing the software, and Saab had frequent communications with Publicover throughout October and November 2009. (Id. ¶¶ 18-19). Samia claims, however, that there was no progress on the development of the 1099 Interest Component despite Publicover's efforts to draw Intuit's attention to that issue. (See id. ¶ 20 & Ex. 2).

On November 20, 2009, Saab and Samia's Senior Property Administrator, Lynn Mark, held a telephone conference with Publicover, Stublarec, and a third Intuit employee, Jyl Jarnigan ("Jarnigan"), to address a number of issues concerning the development of the IRES Program for Samia. (Compl. ¶¶ 23-24). Among the issues that were discussed was the lack of development of the 1099 Interest Component. (Id. ¶ 23). During the course of the conversation, Stublarec allegedly confirmed that he had told Saab that a 1099 Interest Component was included as part of the Intuit IRES Program. (Id. ¶ 25). However, he stated that contrary to his earlier representation, the IRES Program contained no such Component. (Id.).

According to Samia, Saab immediately stated that without the 1099 Interest Component, the deal would be off and Samia would terminate the Agreement. (Id. ¶ 26). In response, Stublarec allegedly promised that the 1099 Interest Component would be developed and delivered to Samia as part of the purchased IRES Program. (Id. ¶ 27). He further assured Saab that Intuit would do "whatever it took" to accomplish that work. (Id.). Samia claims that Saab agreed to proceed with the development and installation of the IRES Program on the basis of Stublarec's representation. (Id. ¶ 28).

Samia contends that development work on the software system, including the 1099 Interest Component, continued slowly through December 2009. (Id. ¶ 29). Although there were many outstanding issues that had to be resolved before the IRES Program could operate, Samia allegedly paid all of Intuit's outstanding invoices. (Id. ¶ 30). Consequently, by the end of 2009, according to Samia, the plaintiff had paid over $60,300 under its Agreement with Intuit. (Id.).

## Developments Following MRI's Purchase of Intuit

Unbeknownst to Samia, Intuit was sold to MRI. (Id. ¶ 37). Thereafter, Saab allegedly stopped hearing from Publicover or anyone else at the defendant's company. (See id. ¶¶ 31, 37). Moreover, Saab's efforts to contact Publicover and Stublarec, and to obtain information regarding their whereabouts, were unsuccessful. (Id. ¶¶ 33-36, 38). Consequently, when Saab received an invoice from MRI for $12,017.72, he decided to withhold payment until the 1099 Interest Component of the IRES Program became fully operational. (Id. ¶¶ 39-40 & Ex. 5).

Saab subsequently learned that Jarnigan remained employed with MRI, and he allegedly notified her of his decision to withhold payment of MRI's invoice. (Id. ¶ 41). Additionally, in an email dated January 23, 2010, Saab notified Jarnigan that there were a number of outstanding issues relating to the development of the IRES Program for Samia. (Id. ¶ 42 & Ex. 7). Those issues concerned, among other things, the 1099 Interest Component, the legal tracking system component of the IRES Program, and scheduling for the development of an Access 24/7 Resident Portal, which Intuit had agreed to pro-

vide under the terms of the parties' Agreement.  (See Compl., Ex. 7; see also Agreement

at Schedule A (listing Access 24/7 Resident Portal)).  On February 11, 2010, Jarnigan

replied that she was attempting to determine the status of the 1099 Interest Component

and the legal tracking system component, but had not received any information.  (Compl.,

Ex. 8).  Samia claims that Saab received no further communications from Jarnigan after

that time.  (See Compl. ¶ 44).

Following Jarnigan's disappearance, David Love ("Love") became Samia's contact

person at MRI.  (Id. ¶ 45).  However, Love was soon replaced by Eric Moorfoot

("Moorfoot"), who was subsequently replaced by Tom Martin.  (Id.).  Although each of

these individuals allegedly acknowledged MRI's commitment to provide the 1099 Interest

Component, as well as other items such as the legal tracking system and the Access 24/7

Resident Portal, Samia contends that the constant change in personnel caused significant

delays in the development work.  (Id. ¶¶ 46-50).  It further claims that despite many

months of effort, only about 80% of the 1099 Interest Component was ever completed.

(Id. ¶ 51).

## Work Authorization Relating to Documents and Letters

Notwithstanding the alleged difficulties Samia was experiencing in its relationship

with MRI, on March 6, 2010, the plaintiff executed a Work Authorization ("Work

Authorization #27661"), pursuant  to which it authorized MRI to perform additional work

for Samia.  (Id. ¶ 53 & Ex. 9).  Work Authorization #27661 was specifically made part of

and incorporated into the parties' Agreement.  (Compl., Ex. 9 at 2).  Thereunder, Samia

agreed to engage MRI to create six separate customized documents and letters, including a 14 Day Notice to Quit Letter, an Amendment to Lease, a Standard Apartment Lease, an Intent to Vacate Letter, a Roommate Substitution Agreement, and a Roommate Addition Agreement. (Id. at 2 & attachments). The project was estimated to cost $16,380, and was scheduled to be completed within 3 weeks. (Id. at 4).

The plaintiff claims that the documents and letters called for under Work Authorization #27661 were critical to Samia's ability to conduct the day-to-day management of its properties. (Compl. ¶ 55). It also claims that the timing of the project was critical because the work was scheduled to take place contemporaneously with the removal of Samia's existing property management software. (Id. ¶ 56). However, MRI allegedly failed to complete the work on time or to deliver a product that functioned properly. (Id. ¶¶ 61-69).

Specifically, Samia alleges that MRI's David Morgan ("Morgan") took primary responsibility for performing the work called for under Work Authorization #27661. (Id. ¶ 58). According to the plaintiff, Morgan made little progress and was unresponsive to Samia's requests for updates about the project. (Id. ¶¶ 59-61). It also claims that on or about April 19, 2010, after a full six weeks had passed, Morgan produced a Functional Report Design containing a written description of the project's components, but abandoned the project before the work necessary to complete it had been done. (Id. ¶¶ 61-65; see also Compl, Ex. 10 at Ex. 2 thereto). Consequently, the documents and letters called for under Work Authorization #27661 allegedly remained incomplete, inaccurate or

entirely missing, and the customer requirements failed to function properly.  (Id. ¶¶ 65-67).

Samia contends that it made repeated efforts to obtain assistance from MRI with respect to the documents and letters, but those efforts proved unsuccessful.  (Id. ¶¶ 70-71).  Accordingly, the plaintiff allegedly had no other choice than to hire a third-party IT professional to complete the work contemplated by the parties under Work Authorization #27661.  (Id. ¶¶ 72-73).  Samia claims that it spent $8,000 to complete the project that MRI had abandoned.  (Id. ¶ 74).

Despite MRI's alleged failure to fulfill the terms of Work Authorization #27661, the defendant issued two invoices to Samia, totaling $16,380, for work associated with the project.  (Compl., Ex. 10 at Ex. 3 thereto).  Samia refused to pay MRI the total amount due.  (See Compl., Ex. 10 at 1).  Rather, in a letter to MRI dated August 24, 2010, Samia's counsel described Morgan's failure to complete the work called for under Work Authorization #27661, and tendered $8,380 as "payment in full" for MRI's efforts on the project.  (Id.).  Samia's counsel also explained that the tendered amount represented the difference between the total amount of MRI's invoices and the amount that Samia had been forced to spend on the IT support necessary to complete the project and render the documents and letters operational.  (Id.).

Allegedly, MRI's Moorfoot assured Samia that the defendant would accept the $8,380 as payment in full for Work Authorization #27661.  (Compl. ¶ 77).  However, on November 17, 2010, Samia received a letter from MRI's General Counsel returning the

$8,380 and rejecting it as payment in full for the invoices relating to Work Authorization #27661.  (Id.; see also Compl., Ex. 11).  Samia claims that MRI has continued to insist on full payment for this work even though it failed to complete it.  (Compl. ¶¶ 78, 80).

### MRI's Alleged Failure to Provide Technical Support

At the time Samia entered into the Agreement with Intuit, the plaintiff also elected to purchase a technical support plan known as the Bronze Plan.  (Agreement at Schedule B).  On March 22, 2010, Samia and MRI entered into an Amendment to the Agreement in order to upgrade Samia's technical support plan to the Silver Plan.  (Compl., Ex. 12). Under the Silver Plan, Samia was entitled to receive 25 hours of prepaid support at an annual cost of $3,000, and any additional support services provided by MRI were to be billed at a rate of $120 per hour.  (Id. at 4).  The term of the Silver Plan ran from the date of execution of the Amendment to August 31, 2010.  (Id. at 4).  Thereafter, the support plan agreement would "renew unless otherwise terminated by the Client."  (Id.).

Samia claims that as the term of the Silver Plan was nearing expiration, MRI improperly eliminated the Silver Plan as a renewal option, and began instead to offer a series of confusing and often times conflicting support plans.  (Compl. ¶¶ 82, 85).  It also claims that the new plans offered unlimited hours of support for a higher annual cost than the Silver Plan.  (Id. ¶ 84; see also Compl., Ex. 12 at 5).  Because Samia found the rates for the new plans excessive, it attempted to renew the Silver Plan by sending MRI a $3,000 payment on September 29, 2010, nearly a month after the Plan had expired.  (Compl. ¶¶ 84, 87; Compl., Ex. 12 at 1-2).  At the same time, Samia sent MRI $9,018 to

renew its support maintenance agreement with MRI, resulting in a total payment of $12,018. (Compl., Ex. 12 at 1-2). In its cover letter, Samia explained the purpose of its payments. (Id.). Samia's check was cashed by MRI "immediately." (Compl. ¶ 89).

After cashing Samia's check, MRI allegedly informed Samia that the support maintenance fee included unlimited general support, which rendered the Silver Plan redundant and unnecessary. (Id. ¶ 90). Accordingly, Samia demanded that MRI return the $3,000 that it had paid for technical support. (Id. ¶ 91). Samia claims that MRI refused to refund the money, and has failed to explain what it did with those funds. (Id. ¶¶ 91-92). It also contends that despite its payment in full for two support options, MRI terminated all of Samia's technical and maintenance support on February 25, 2011, claiming that Samia owed it over $12,000 in unpaid invoices. (Id. ¶¶ 95-96). Allegedly, MRI's decision to terminate Samia's support made it impossible for the plaintiff to implement various components of the IRES Program that MRI had failed to complete, and left it with a minimally functioning property management system. (Id. ¶¶ 97-99).

### Alleged Non-Functioning and Non-Existent System Components

The plaintiff claims that as a result of MRI's conduct, it has been left with a number of non-functioning or non-existent system components. (Id. ¶ 101). In addition to the 1099 Interest Component, which was allegedly 80% completed, the alleged non-functioning components include a lease renewal component and the legal tracking program, and the alleged non-existent components include the Access 24/7 Resident Portal and a promised correction for erroneously committed MRI SODAs following the

-11-

vacancy of a rental unit.  (Id. ¶¶ 51, 102-05).  According to Samia, each of these components was required as part of the system that the plaintiff purchased from the defendant pursuant to the terms of the Agreement.  (See id. ¶ 106).

Additional factual details relevant to this court's analysis are described below where appropriate.

## III.  ANALYSIS

### A.  Standard of Review

MRI has moved to dismiss all of Samia's claims against it for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings.  Thus, when confronted with a motion to dismiss, the court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff.  Cooperman, 171 F.3d at 46.  Dismissal is only appropriate if the complaint, so viewed, fails to allege a "plausible entitlement to relief."  Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)).

Two underlying principles must guide the court's assessment as to the adequacy of the pleadings to support a claim for relief.  Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009).  "'First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'  Such conclusory statements are 'not entitled to the assumption of truth.'"  Id. (quoting

-12-

Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009))

(internal citations omitted).  "'Second, only a complaint that states a plausible claim for

relief survives a motion to dismiss.'"  Id. (quoting Ashcroft, 556 U.S. at 679, 129 S. Ct. at

1950).  "This second principle recognizes that the court's assessment of the pleadings is

'context-specific,' requiring 'the reviewing court to draw on its judicial experience and

common sense.'  '[W]here the well-pleaded facts do not permit the court to infer more

than the mere possibility of misconduct, the complaint has alleged – but it has not

show[n] – that the pleader is entitled to relief.'"  Id. (quoting Ashcroft, 556 U.S. at 679,

129 S. Ct. at 1950) (internal quotations and citation omitted; alterations in original).

**B.      Counts I, III, V, and VIII: Claims for Breach of Contract**

In Counts I, III, V and VIII, Samia has asserted claims for breach of contract based

on the defendant's alleged failure to provide an operable 1099 Interest Component (Count

I), alleged failure to complete Work Authorization #27661 (Count III), alleged actions in

terminating Samia's technical support (Count V), and alleged conduct in leaving Samia

with non-functioning and non-existent software system components (Count VIII).  MRI

has moved to dismiss each of these Counts for failure to state a claim.  For the reasons

that follow, this court recommends that MRI's motion be denied with respect to Samia's

breach of contract claims.

**i.      The 1099 Interest Component (Count I)**

In  Count I of its Complaint, Samia alleges that the defendant breached the parties'

Agreement by failing to provide Samia with an operable 1099 Interest Component.  MRI

argues that Count I fails to state a claim because the Agreement contains no terms which required MRI to provide Samia with an IRES Program containing a 1099 Interest Component, and the plain language of the Agreement precludes the plaintiff from relying either on evidence of Stublarec's pre-contract representations, or on statements made by Stublarec or others after the Agreement was executed, to broaden MRI's obligations under the Agreement. (Def. Mem. (Docket No. 9) at 9-13). As described below, this court finds that there is an ambiguity in the Agreement as to the components of the software that the defendant was obligated to provide to Samia. Therefore, Samia may rely on extrinsic evidence, including Stublarec's representations regarding the 1099 Interest Component, in order to establish the parties' intent at the time they entered into the Agreement.

## General Principles of Contract Interpretation

The parties' dispute requires this court to interpret the Agreement to determine whether it excludes a 1099 Interest Component. It is undisputed that interpretation of the Agreement is governed by the law of Massachusetts.[4] (See Def. Mem. at 10; Pl. Mem. (Docket No. 11) at 4 n.2). As the First Circuit recently explained,

> "[U]nder Massachusetts law, interpretation of a contract is ordinarily a question of law for the court, and, as a question of law, is subject to plenary review." *Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d 420, 424 (1st Cir. 1998) (internal quotation marks and citation omitted).

---

[4] The Agreement contains a choice of law provision, which provides that "[t]he validity and performance of this Agreement shall be governed by Massachusetts law (without regard to its choice of law principles)." (Agreement ¶ 11.7).

> A court interpreting a contract must first assess whether the contract is ambiguous. *See Bank v. Thermo Elemental Inc.*, 451 Mass. 638, 888 N.E.2d 897, 907 (2008). "To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." *Id.* "Ambiguity is not created merely because the litigants disagree about the meaning of a contract." *Nicolaci v. Anapol*, 387 F.3d 21, 26 (1st Cir. 2004). Rather, "a contract is only ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d at 424 (internal quotation marks and citation omitted).

Farmers Ins. Exchange v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011).

"Once the contract is determined to be ambiguous, the court is free to look to extrinsic evidence in order to give a reasonable construction in light of the intentions of the parties at the time of formation of the contract." President & Fellows of Harvard Coll. v. PECO Energy Co., 57 Mass. App. Ct. 888, 896, 787 N.E.2d 595, 601 (2003) (internal citation omitted). "When such evidence is considered, it may be that a logical answer consistent with the purposes of the agreement[ ] and the intentions of the parties will emerge." Id.

When interpreting a contract under Massachusetts law, the court "must put [itself] in the place of the parties to the instrument and give its words their plain and ordinary meaning in the light of the circumstances and in view of the subject matter." Polito v. Sch. Comm. of Peabody, 69 Mass. App. Ct. 393, 396, 868 N.E.2d 624, 627 (2007) (quotations and citations omitted). "When construing a commercial contract, '[c]ommon sense is as much a part of contract interpretation as is the dictionary or the arsenal of

canons.'"  Teragram Corp. v. Marketwatch.com, Inc., 444 F.3d 1, 9 (1st Cir. 2006)

(quoting Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302 (1st Cir. 2001)).

## Existence of an Ambiguity

This court finds that the plain language of the Agreement can support reasonable

differences of opinion as to whether the defendant was obligated to provide software

containing a 1099 Interest Component.  Pursuant to the Agreement, Intuit agreed, in

relevant part, to grant Samia the right to install a copy of the "Licensed Programs" on its

internal business computer system located at its offices in Brighton, Massachusetts.  (See

Agreement at Schedule A ¶¶ 1.5, 3.1).  The term "Licensed Programs" is defined in the

Agreement to mean "those software programs as defined in Schedule A/A1, if applica-

ble." (Agreement ¶ 1.7).  There is no Schedule A1.  Schedule A defines the term

"Licensed Programs" as "the machine-readable, object code version software as specified

in this Schedule A, including any Updates and Upgrades thereto that Intuit delivers to the

Client hereunder."  (Id. at Schedule A ¶ 2.3).  The "Intuit User Licensed Programs"

specified in Schedule A consist of the following: "Residential Management," "Residential

Management Electronic Lockbox," "Facility Management," "Accounts Payable,"

"General Ledger," "ReportDesign," "WebDesign," "Advanced User Security," "Virtual

Site (Includes Distributive Processing)," and "1 SQL Database."  (Id. at Schedule A).

There is nothing in Schedule A or elsewhere in the Agreement which further defines the

Licensed Programs or describes their content.

Samia argues that the programs listed in Schedule A provide "only a summary of broad based functionality" that do not expressly exclude a 1099 Interest Component as a component part of the software. (Pl. Mem. at 5). This court finds that Samia's interpretation of the Agreement is reasonable in light of the plain language used in Schedule A. Although certain of the Licensed Programs, such as the General Ledger and Accounts Payable programs, suggest a specific content relating to specific accounting functions, other programs, such as the Residential Management, Facility Management and ReportDesign programs, are too broadly worded to support any definitive conclusions regarding their content. As described above, the 1099 Interest Component was allegedly described by Saab in his negotiations with Intuit as an interest reporting component for residential tenant deposits that would produce forms that could be sent to Samia's tenants. (See Compl. ¶¶ 11, 14). Samia could have reasonably believed that this function would be included as a component of the Residential Management program, the ReportDesign program, or even or as a component of one of the other broadly defined programs set forth in Schedule A. Accordingly, this court finds that the Agreement is ambiguous with respect to the contents of the Licensed Programs.

MRI points out that Schedule I to the Agreement also contains no reference to a 1099 Interest Component. (Def. Mem. at 9). Schedule I consists of a work authorization regarding the implementation of certain software applications at Samia's facility, including the General Ledger, Accounts Payable, Residential Management, Facility Management, and Resident Portal Licensed Programs. (Agreement at Schedule I at 1).

Again, however, there is nothing in Schedule I which further defines or describes the components of these applications, and there is nothing to suggest that the Residential Management or Facility Management applications excluded a 1099 Interest Component. Because the specific content of the applications is reasonably subject to dispute, the plain language of Schedule I does not establish that the Agreement contains no term requiring MRI to provide an IRES Program with a 1099 Interest Component.

This court's conclusion that there may be components of the Licensed Programs which are not specified is consistent with other allegations set forth in the Complaint regarding the content of the software that the defendant did provide to Samia. In particular, Samia alleges that the software included a legal tracking component that was installed on the plaintiff's system, but contained many bugs and crashed frequently. (Compl., ¶ 23 & n.2). Schedule A does not list legal tracking among the Licensed Programs, and there appears to be no specific reference to legal tracking elsewhere in the Agreement. Therefore, these allegations support Samia's argument that the programs listed in Schedule A provide only a summary of broad based functionality that create an ambiguity with respect to their content.

### Consideration of Extrinsic Evidence

MRI argues that the Agreement contains an integration clause, which prohibits Samia from relying on extrinsic evidence of Stublarec's oral representations to support its breach of contract claim with respect to the 1099 Interest Component. (Def. Mem. at 10). The integration clause reads in relevant part as follows:

> Client[5] acknowledges that this Agreement is a complete statement of the agreement between it and Intuit with respect to any Licensed Programs, ... Consulting Services, Application and Technical Support Services, or Software Maintenance Services, and that there are no other prior or contemporaneous understandings, promises, representations, or descriptions relating to the subject matter hereof.

(Agreement ¶ 11.1). Under the circumstances of this case, however, the existence of an integration provision does not bar Samia from introducing extrinsic evidence of the parties' intent at the time they entered into the Agreement.

"The parol evidence rule only bars the introduction of prior or contemporaneous written or oral agreements that contradict, vary, or broaden an integrated writing . . . . It does not bar extrinsic evidence that elucidates the meaning of an ambiguous contract." Winchester Gables, Inc. v. Host Marriott Corp., 70 Mass. App. Ct. 585, 591, 875 N.E.2d 527, 533 (2007) (quoting Kobayashi v. Orion Ventures, Inc., 42 Mass. App. Ct. 492, 496, 678 N.E.2d 180 (1997)). Accordingly, where, as here, the relevant terms of an integrated contract are ambiguous, "evidence of the circumstances and conditions under which it was entered into are admissible, not to contradict, enlarge or vary its terms by parol, but for the purpose of ascertaining the true meaning of its language as used by the parties." Id. (quoting Waldstein v. Dooskin, 220 Mass. 232, 235, 107 N.E.2d 927 (1915)). As described above, Samia alleges that Stublarec repeatedly assured the plaintiff that the IRES Program contained a 1099 Interest Component. (See Compl. ¶¶ 11, 12, 14-16). Therefore, Samia has alleged facts showing that at the time the parties entered into the

---

[5] The term "Client" refers to Samia. (Agreement at 2).

Agreement, they understood that the Licensed Programs listed in Schedule A included a 1099 Interest Component. The motion to dismiss Count I should be denied.[6]

### ii. Work Authorization #27661 and Non-Functioning/Non-Existent Software System Components (Counts III & VIII)

In Counts III and VIII, Samia is seeking to hold MRI liable for breach of contract based on its alleged failure to complete Work Authorization #27661 and its alleged conduct in leaving Samia with non-functioning and non-existent software system components. MRI contends that these claims should be dismissed because the Agreement provides only limited warranty protection for such deficiencies, and Samia failed to comply with the notice requirements necessary to trigger those protections. (Def. Mem. at 13-17). For the reasons that follow, this court recommends that the motion to dismiss these Counts be denied, and that the plaintiff have an opportunity to develop the factual record with respect to these claims.

---

[6] MRI argues that the Agreement expressly prohibits the parties from amending its terms based on oral statements, and that therefore, Samia may not claim that the Agreement was amended to include a 1099 Interest Component based on statements that were made by Stublarec or others after the Agreement was executed. (Def. Mem. at 10-13). However, Samia does not claim that the Agreement was amended orally after the parties entered into it. Rather, it claims that any post-contract representations by Stublarec or others that the IRES Program included a 1099 Interest Component were merely "an affirmation of the existing contract[.]" (Pl. Mem. at 8 & n.4).

### The Warranty Provisions

The Agreement expressly limits the warranty protections available to Samia for programs and services that the defendant agreed to provide under the Agreement. In particular, Section 3.8 of the Agreement provides in relevant part that

> Client shall test any project elements involving report writing, third-party interfaces or database customizations, and notify Intuit of all potential deficiencies relative to the applicable specifications for such work within the thirty (30)-day Warranty Period (as defined below) after Intuit's Delivery (as defined below) of such project elements to Client. Subject to Client's timely notification, Intuit will re-perform the applicable Consulting Services[7] required to meet the applicable specifications....

(Agreement ¶ 3.8). Additionally, Section 5 of the Agreement, which is entitled "WARRANTY," reads as follows:

> Intuit warrants that for a period of thirty (30) days (the "Warranty Period") following Delivery[8] by Intuit to Client, any Licensed Program ... will conform in all material respects with the applicable Documentation ("Warranty Criteria") provided to Client by Intuit. In the event that Client determines that any Licensed Program ... as delivered to Client by Intuit fails to conform to the Warranty Criteria and Client delivers to Intuit notice of such failure within the Warranty Period (and such notice shall detail the specific non-conformities), Intuit shall repair or replace the specific non-

---

[7] The term "Consulting Services" is defined in the Agreement as "services delivered by Intuit, or by a third party on Intuit's behalf, in the implementation of any Licensed Programs or NetSource Services delivered hereunder." (Agreement ¶ 1.4).

[8] "Delivery" is defined in Schedule A of the Agreement as "the date that Intuit (i) delivers those Licensed Programs specified in this Schedule A, as contained on physical media, and as delivered by Intuit employee, to Client, (ii) delivers such Licenced Programs, as contained on physical media, to a common carrier for shipment to Client, or (iii) makes such Licensed Programs available for electronic download by Client, whichever such date shall occur earliest." (Agreement at Schedule A ¶ 2.2).

> conformities as soon as practicable at no additional charge to Client.
> The foregoing warranty states Client's sole and exclusive remedy,
> and Intuit's entire liability, with respect to the warranty....

(Id. ¶ 5). Accordingly, under Sections 3.8 and 5 of the Agreement, the defendant agreed

to provide Samia with limited relief, subject to Samia's timely notification, in the event

the Licensed Programs failed to perform as promised in Intuit's written documentation, or

in the event that the reports called for under Work Authorization #27661 failed to comply

with any applicable specifications.

In Section 6 of the Agreement, which is entitled "DISCLAIMER OF

WARRANTIES," the defendant expressly disclaimed any further warranties relating to

programs or services provided to Samia under the terms of the Agreement. As that

provision states:

> EXCEPT AS EXPRESSLY PROVIDED IN SECTION 5 ABOVE,
> THIS AGREEMENT, ANY LICENSED PROGRAMS AND/OR ...
> CONSULTING SERVICES, AND ANY RELATED SERVICES OR
> CONTENT ACCESSIBLE THROUGH THE LICENSED
> PROGRAMS ... OR OTHER RELATED SERVICES, ARE
> PROVIDED "AS-IS," AND TO THE MAXIMUM EXTENT
> PERMITTED BY APPLICABLE LAW, INTUIT DISCLAIMS ALL
> OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS
> OR IMPLIED, REGARDING THE LICENSED PROGRAMS,
> DISKS ... CONSULTING SERVICES, RELATED MATERIALS
> AND ANY RELATED SERVICES OR CONTENT, INCLUDING
> ANY IMPLIED WARRANTIES RELATING TO FITNESS FOR A
> PARTICULAR PURPOSE, MERCHANTABILITY, NON-
> INFRINGEMENT OR TITLE, AND WARRANTIES ARISING
> FROM COURSE OF DEALING, USAGE OR TRADE. INTUIT
> DOES NOT WARRANT THAT THE LICENSED PROGRAMS ...
> OR ANY RELATED SERVICES OR CONTENT ARE FREE
> FROM BUGS, ERRORS, OR OTHER PROGRAM LIMITATIONS
> NOR DOES INTUIT WARRANT ACCESS TO THE INTERNET

OR TO ANY OTHER SERVICE OR CONTENT THROUGH THE
LICENSED PROGRAMS ... OR OTHER RELATED SERVICES,
OR THAT IT CAN CONVERT ALL OF CLIENT'S DATA.  NO
ADVICE OR INFORMATION, WHETHER ORAL OR WRITTEN,
OBTAINED FROM INTUIT OR ELSEWHERE WILL CREATE
ANY WARRANTY NOT EXPRESSLY STATED IN THIS
AGREEMENT....

(Id. ¶ 6).  Therefore, according to Intuit, Sections 3.8 and 5 set forth the sole remedies

available to Samia with respect to any deficiencies in the reports and documents called

for under Work Authorization #27661 and for the failure of the Licensed Programs to

perform.

In order to satisfy the notice requirements necessary to trigger the protections set

forth in Sections 3.8 and 5, Samia had to comply with the following notice provision set

forth in Section 11.9 of the Agreement:

Except as otherwise specified herein, all notices, demands or
communications required hereunder shall be in writing and delivered
personally, or sent either by U.S. certified mail, postage prepaid
return receipt requested, or by overnight delivery air courier (e.g.,
Federal Express) to the parties at their respective addresses set forth
above in this Agreement and, for Intuit, with a copy to: Intuit Inc.,
Attention: General Counsel, Law Department, P.O. Box 7850,
Mountain View, California 94039-7850.  All such notices, requests,
demands, or communications shall be deemed effective immediately
upon receipt....

(Id. ¶ 11.9).  In general, the failure to comply with this provision could preclude Samia

from obtaining relief under Sections 3.8 and 5 of the Agreement.  See Teragram Corp. v.

Marketwatch.com, Inc., No. Civ. A. 02-11138-DPW, 2004 WL 3086883, at *6 (D. Mass.

Dec. 29, 2004) (failure of party to comply with warranty provisions by providing written

notice of alleged breach within 30 days after delivery of software warranted summary judgment against that party on its breach of contract claim), aff'd, 444 F.3d 1 (1st Cir. 2006).

## Adequacy of Samia's Allegations

MRI argues that Samia's breach of contract claims relating to Work Authorization #27661 and the non-functioning and non-existent software system components must be dismissed because the only relief available for such deficiencies is the relief set forth in Sections 3.8 and 5 of the Agreement, and Samia has failed to allege that it provided the notice required to obtain that relief. This court finds that MRI's argument is not sufficient to defeat Counts III or VIII at this stage in the litigation.

As an initial matter, under the plain terms of the Agreement, the 30-day notice requirement set forth in Sections 3.8 and 5 was set to run from the date of delivery of the project elements or the Licensed Programs. However, Samia has alleged that the documents and letters called for under Work Authorization #27661 remained incomplete, inaccurate or entirely missing due to Morgan's abandonment of the project, and that MRI failed to provide it with certain components of the software system. (Compl. ¶¶ 65-66, 104-05). These allegations raise questions of fact as to when and to what extent delivery actually occurred under the Agreement, and whether the 30-day notice period even began to run with respect to that work. Because those questions cannot be resolved on a motion to dismiss, Samia should have an opportunity to develop the factual record relating to the claims set forth in Counts III and VIII.

Additionally, the fact that Samia did not allege facts showing that it complied with the notice requirement of the warranty provisions is not sufficient to defeat its claims at this point in the proceedings. The plaintiff is not required to plead breach of contract claims with particularity, and it has no obligation to present evidence at this stage in the litigation. See Fed. R. Civ. P. 8(a)(2) (requiring complaint to include only "a short and plain statement of the claim showing that the pleader is entitled to relief"). To the extent Samia has alleged facts regarding complaints that it made to MRI or concerning the August 24, 2010 letter from its counsel to MRI regarding the defendant's alleged failure to complete work under Work Authorization #27661, nothing in those allegations suggests that those were the only occasions on which it complained of MRI's failure to fulfill its contractual obligations, or that it otherwise failed to provide timely notice under Sections 3.8 and 5 of the Agreement. Consequently, it would be premature to dismiss Counts III and VIII before Samia has an opportunity to engage in discovery.

### iii.  <u>Alleged Termination of Technical Support (Count V)</u>

In Count V of its Complaint, Samia alleges that MRI's actions in terminating its technical support, despite Samia's payment in full for such support, constitutes a breach of the Agreement. Although the question is a close one, this court recommends that the motion to dismiss Count V be denied. Despite the fact that Samia's allegations establish that its technical support plan expired on August 31, 2010, and that it did not make payment before then, there are also allegations that MRI offered conflicting and confusing plans, unilaterally attempted to terminate the Silver Plan, and accepted a late

payment which was for the express purpose of extending the Silver Plan coverage. Thus, whether MRI was obligated to renew Samia's plan should be decided on a more complete record.

As described above, Samia alleges that the parties entered into an Amendment to the Agreement on March 22, 2010, under which the parties agreed to upgrade Samia's technical support plan to the Silver Plan. (Compl., Ex. 12). The annual cost of the Silver Plan was $3,000, and the term of the support services provided under the Amendment was due to expire on August 31, 2010. (Id. at 4). The Amendment provides that Samia's technical support plan would "renew unless otherwise terminated by the Client." (Id.).

Pursuant to the Amendment, the parties agreed that "[e]xcept as expressly provided herein, nothing in this Amendment shall be deemed to waive or modify any of the provisions of the Agreement, which otherwise remains in full force and effect." (Id. ¶ 3). Under the general provisions of the Agreement relating to renewals for technical support, the defendant agreed to send Samia an invoice prior to the expiration of its support plan, and to renew the plan as of its expiration date upon Samia's timely payment of the invoice.[9] (See Agreement at Schedule A ¶¶ 8.3-8.4). The parties also agreed that

---

[9] Specifically, the renewal provision reads: "Prior to the end of each Service Year, Intuit shall send an invoice for Application and Technical Support Services to Client. Timely payment of such invoice shall renew the Service Year as of its anniversary date. Client's failure to timely pay such invoice shall terminate Intuit's obligation to provide the Application and Technical Support Services in the subsequent Service Year and subjects Client to higher technical support hourly rates if Client calls for such support as compared to customers with paid maintenance plans, and in such event, Client will receive Application and Technical Support at the basic support level, as designated by Intuit from time to time. Following the Initial Service Year, Intuit reserves the right to increase the price for Application and Technical Support Services."

"Client's failure to timely pay such invoice shall terminate Intuit's obligation to provide the Application and Technical Support Services in the subsequent Service Year . . . ." (Agreement at Schedule A ¶ 8.4).  Additionally, they agreed that the defendant reserved the right to increase the price for technical support services.  (Id.).

Samia alleges that as the term of the Silver Plan was nearing expiration, the defendant unilaterally, and in breach of its terms, decided to terminate the Silver Plan, and to replace it with a higher cost option, which it offered to Samia in lieu of the Silver Plan.  (Compl. ¶¶ 82-86 & Ex. 12 at 5).  Samia further alleges that it declined to pay the higher rate for technical support, and instead decided to renew the Silver Plan by sending MRI a $3,000 payment nearly a month after its Plan had expired.  (Id. ¶ 87 & Ex. 12 at 1-2).  Samia further alleges that MRI accepted the late payment by immediately cashing the check.  (Compl. ¶ 89).  Since it cannot be stated with certainty that MRI had no obligation to provide Samia with a technical services contract, the motion to dismiss Samia's breach of contract claim based on MRI's termination of technical support should be denied.

### C.   Counts II, IV, VI and IX: Claims for Misrepresentation

---

(Agreement at Schedule A ¶ 8.4).  A "Service Year" is defined in the Agreement as a twelve (12) calendar month period.  (Id. ¶ 8.3).

MRI is also seeking to dismiss Counts II, IV, VI and IX in which Samia has asserted claims for negligent misrepresentation[10] based on the defendant's alleged failure to fulfill its promises to provide Samia with a 1099 Interest Component (Count II), its alleged failure to provide documents required under Work Authorization #27661 (Count IV), its alleged termination of technical support (Count VI), and its alleged actions in leaving Samia with non-functioning and non-existent software system components (Count IX). For the reasons detailed herein, this court recommends that MRI's motion to dismiss be allowed with respect to Counts IV, VI and IX, but denied with respect to Count II.

### i.  Statements Concerning the 1099 Interest Component (Count II)

Samia alleges, in Count II of its Complaint, that the defendant's statements regarding the inclusion of a 1099 Interest Component in the IRES Program constituted material misrepresentations on which Samia relied. MRI contends that this claim should be dismissed because any reliance on Stublarec's alleged pre-contract representations is barred by the integration clause of the Agreement, and because Stublarec's post-contract promises to build a 1099 Interest Component do not constitute actionable misrepresentations. (Def. Mem. at 6-8). For the reasons detailed herein, this court concludes that the

---

[10]  Although the Complaint does not indicate whether Samia is claiming fraudulent misrepresentation or negligent misrepresentation, based on the pleadings, it is clear that Samia is seeking to hold MRI liable for negligent misrepresentation. (See Def. Mem. at 6 n.4; Pl. Mem. at 4 (describing elements necessary to establish liability for negligent misrepresentation under Massachusetts law)).

presence of an integration clause does not defeat Samia's claim based on pre-contract representations.

### Reliance on Pre-Contract Statements

In order to state a claim for negligent misrepresentation, the plaintiff must allege facts showing that the defendant,

> in the course of [its] business, profession or employment, or in any other transaction in which [it] had a pecuniary interest, supplied false information for the guidance of others in their business transactions without exercising reasonable care or competence in obtaining or communicating the information, that those others justifiably relied on the information, and that they suffered pecuniary loss caused by their justifiable reliance upon the information.

Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 471-72, 918 N.E.2d 36, 48 (2009) (quotations, citations and punctuation omitted). Accordingly, "justifiable reliance is integral to a claim for negligent misrepresentation." Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 59, 809 N.E.2d 1017, 1031 (2004). Moreover, "in some circumstances a plaintiff's reliance on oral statements in light of contrary written statements is unreasonable as a matter of law." Id.

MRI argues that in this case, the Agreement's integration clause constitutes a contrary written statement which makes Samia's reliance on Stublarec's pre-contract statements unreasonable as a matter of law. (Def. Mem. at 6-7). However, in Marram, the Supreme Judicial Court held that generally courts should not dismiss claims of negligent misrepresentation solely on the basis of an integration clause. Id. at 59-60, 809 N.E.2d at 1031 (finding that issue of plaintiff's reliance on oral representations was not

-29-

ripe for decision at motion to dismiss stage despite existence of integration clause).

Moreover, as in <u>Marram</u>, "there is no factual record that the specific oral representations [MRI] allegedly made to [Samia] were contradicted elsewhere." <u>Id.</u> at 60, 809 N.E.2d at 1031-32. As the Court explained in language applicable here, "without any factual record developed through discovery, [courts] cannot conclude that, as a matter of law, no factual scenario exists under which the plaintiff might establish a claim of negligent misrepresentation" notwithstanding the presence of an integration clause. <u>Id.</u> at 61, 809 N.E.2d at 1032. Regardless of whether the integration clause of the parties' Agreement may ultimately bar Samia's misrepresentation claim based on pre-contract assurances that the IRES Program contained a 1099 Interest Component, it would be inappropriate to dismiss that claim at this juncture in the case.[11]

### ii.    Remaining Misrepresentation Claims (Counts IV, VI and IX)

By its remaining Counts for negligent misrepresentation, Samia alleges that MRI's failure to provide documents pursuant to Work Authorization #27661, its conduct in terminating Samia's technical support despite payment in full, and its conduct in leaving Samia with non-functioning and non-existent software system components, constituted material misrepresentations on which the plaintiff relied. However, the "failure to per-

---

[11] MRI also argues that Samia cannot rely on post-contract assurances about the functionality of the 1099 Interest Component because there is no evidence that it had no intention to perform its obligations when the statements were allegedly made. Since, however, Samia has not limited itself to specific representations in Count II, and there is a basis for the Count to remain based on pre-contract representations, this court declines to give an advisory opinion as to the validity of the claims based on other alleged misrepresentations.

form a contractual duty does not give rise to a tort claim for negligent misrepresentation." Cumis Ins. Soc'y, Inc., 455 Mass. at 474, 918 N.E.2d at 49. Because Samia has not alleged that Intuit or MRI made any statements or representations relating to these subjects apart from what is stated in the parties' written Agreement, this court recommends that Counts IV, VI and IX of the Complaint be dismissed.

### D.   Count VII: Claim for Conversion

In Count VII, Samia is seeking to hold MRI liable for conversion based on the defendant's alleged failure to return or account for the $3,000 that Samia paid MRI for technical support on September 29, 2010. MRI argues that Samia's claim must be dismissed because it did not appropriate Samia's money for itself, but rather credited $2,436.75 of the funds to Samia's account, where they remain today for its use. (Def. Mem. at 19). Because MRI's argument is based on evidence outside the Complaint, which may not be considered on a motion to dismiss, this court recommends that its motion be denied with respect to Count VII.

"The elements of conversion may be established by a showing that one person exercised dominion over the personal property of another, without right, and thereby deprived the rightful owner of its use and enjoyment." In re Hilson, 448 Mass. 603, 611, 863 N.E.2d 483, 491 (2007). In the instant case, Samia alleges that it overpaid MRI $3,000 for technical support that was redundant and unnecessary, and which MRI failed to provide. (See Compl. ¶¶ 87-90, 96). It also alleges that MRI refused to refund the

money to Samia, despite the plaintiff's demand that it do so, and failed to account for the funds. (Id. ¶¶ 91-92). Accordingly, the plaintiff has stated a claim for conversion.

In support of its argument that it did not misappropriate Samia's money or deprive Samia of its funds, MRI relies on a document which purports to be a statement of Samia's account at MRI showing a credit of $2,436.75. (Def. Mem. at Ex. C). However, on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "the district court may properly consider only facts and documents that are part of or incorporated into the complaint[.]" Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524 F.3d 315, 321 (1st Cir. 2008). It is only when "a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), that [a] document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Id. (quoting Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16-17 (1st Cir. 1998)) (punctuation omitted). The document attached to MRI's memorandum does not meet this standard. In its Complaint, Samia makes no reference to an account statement or to any credit to Samia's account at MRI. Rather, it alleges that MRI refused to comply with its demand for a refund, and failed to explain what it did with Samia's funds. (Compl. ¶¶ 91-92). Therefore, this court declines to consider the document, and recommends that MRI's motion to dismiss the conversion claim be denied.[12]

---

[12] Even if this court were to consider MRI's exhibit, it would not account for the entire $3,000 that Samia claims was wrongfully converted by MRI and would not necessarily

### E.     Count X: Claim Under Mass. Gen. Laws ch. 93A

Finally, MRI has moved to dismiss Samia's claim under Mass. Gen. Laws ch. 93A ("Chapter 93A") on the grounds that the conduct Samia is challenging amounts to nothing more than a breach of contract, which is insufficient to support a claim under Chapter 93A.  (Def. Mem. at 19-20).  This court disagrees and concludes that the Chapter 93A claim should not be dismissed.

Admittedly, "[a] breach of contract, standing alone, is not an unfair trade practice under c. 93A."  Zabin v. Picciotto, 73 Mass. App. Ct. 141, 169, 896 N.E.2d 937, 963 (2008).  "Instead, to rise to the level of a c. 93A violation, a breach must be both knowing and intended to secure 'unbargained-for benefits' to the detriment of the other party."  Id. Additionally, "[t]he breaching party's conduct must exceed the level of mere self-interest, rising instead to the level of commercial extortion or a similar degree of culpable conduct."  Id. (quotations and citations omitted).  While not flushed out at this point, Samia has alleged that MRI abandoned its project completely while continuing to demand payment.  Further factual development is appropriate before the court determines whether its conduct in failing to fulfill its contractual obligations rises to the level of a ch. 93A violation.

In any event, Samia may pursue a claim under Chapter 93A based on the defen- dant's alleged misrepresentations.  Under Massachusetts law, "a negligent misrepresenta-

<hr>

demonstrate that MRI did not deprive Samia of the use and enjoyment of its money.

tion may be so extreme or egregious as to constitute a violation of G.L. c. 93A, § 11[.]" Marram, 442 Mass. at 62, 809 N.E.2d at 1032.  Because Samia's claim for negligent misrepresentation remains viable and has yet to be fully developed, it would be inappropriate to dismiss the Chapter 93A claim at this juncture.  See id. (ruling that Chapter 93A claim based on alleged negligent misrepresentations made to plaintiff prior to its investment in defendant's mutual fund survived motion to dismiss).  Therefore, this court recommends that the motion to dismiss Count X be denied.[13]

## IV.  CONCLUSION

For all the reasons detailed above, this court recommends to the District Judge to whom this case is assigned that "Defendant MRI Software LLC's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)" (Docket No. 8) be ALLOWED IN PART and DENIED IN PART.  Specifically, this court recommends that Counts IV, VI and IX be dismissed, but that MRI's motion otherwise be denied.[14]

---

[13]  Neither party has addressed whether an alleged act of conversion can serve as a predicate to a claim under Chapter 93A.  Because the question as to what constitutes unfair or deceptive acts under Chapter 93A "ordinarily must be determined from the circumstances of each claim[,]" the parties should have the opportunity to address this issue following development of the factual record.  See Marram, 442 Mass. at 61, 809 N.E.2d at 1032.

[14]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616

_____ / s / Judith Gail Dein_____
Judith Gail Dein
U.S. Magistrate Judge

---

F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).