# Exhibit A

# INTUIT.

Intuit Inc.

## Real Estate Solutions

Master License & Services Agreement

for

## Samia Companies, LLC

July 30, 2009

The prices quoted in any attached proposal are guaranteed July 31, 2009.

**MASTER LICENSE & SERVICES AGREEMENT**

"Effective Date": _7/31/09_

"Intuit":    **Intuit Inc.**, a Delaware corporation
20800 Harvard Road, Cleveland, Ohio 44122

Phone: 216-464-3225, Fax: 516-213-1446

"Client":    *Samia Companies, LLC, Massachusetts limited liability company, 60 Leo Birmingham Parkway, Brighton, MA 02135*

Phone: *617-783-1024*   Fax:

THIS MASTER LICENSE & SERVICES AGREEMENT, which includes these cover pages, the attached Intuit Standard Terms and Conditions and all Schedules, and any Project Plans or Statements of Work, issued hereunder, and any related amendments or additions (collectively, the "Agreement"), is made and effective as of the above Effective Date by and between Intuit and Client, as named above, on its own behalf and on behalf of its direct or indirect Affiliated Entities (as defined herein), if any (collectively referred to hereafter as "Client").

The above parties acknowledge that the terms and conditions set forth in this Agreement constitute good and valuable consideration, and hereby agree to be bound as provided herein.

| SCHEDULE | SCHEDULES DESCRIPTION | Initial Fees |
|---|---|---|
| "A" | User Licensed Programs & Fees Schedule | $40,200 |
| "B" | Software Maintenance Services and Applications and Technical Support Services & Fees Schedule | $7,957 |
| "F" | Client Contact Listing *(To be completed by Client upon execution of this Agreement)* | |
| "I" | Consulting Services & Fees Schedule and Statement of Work | $45,160 |
| | Shipping and Handling | $20 |
| | Total Initial Fees | $93,337 |
| | * Initial Payment Due | $28,077 |

\* Please fax a copy of the signed Agreement to:

*Intuit Inc.*
*Attn: Sandy Sholtis*
*Fax: 216-916-4892*

Also, please submit initial payment and all, or any portion, of the fees as noted in the applicable Schedules in the Agreement to:

*Intuit Inc.*
*P.O. Box 51887*
*Los Angeles, CA 90051-6187*

   **IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the Effective Date.

| CLIENT | INTUIT INC. |
|---|---|
| By: | By: |
| Name: _Leonard J. Samia_ | Name: _Tim Gallagher_ |
| Title: _Principal_ | Title: _Director_ |
| Date Signed: _7-31-09_ | Date Signed: _7/31/09_ |

## Terms and Conditions

**1.     DEFINITIONS.** In addition to any capitalized terms elsewhere defined in the Agreement, the following capitalized terms shall have the same meaning given them below for the purposes of this Agreement.

1.1     "Affiliated Entities" shall mean an entity controlling, controlled by or under common control with a party to the Agreement during the Term hereof where control means the ownership or control, directly or indirectly, of more than fifty percent (50%) of all the voting power of the shares (or other securities or rights) entitled to vote for the election of directors or other governing authority.

1.2     "Confidential Information" shall mean information disclosed under this Agreement by or on behalf of one party disclosing such information to another party ("Disclosing Party"), whether tangible, intangible, written, oral, embedded or expressed in computer code, or by any other means that (i) derives independent economic value, actual or potential from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; (iii) concerning its business or activities that (a) would be reasonably considered to be proprietary or confidential, including: source code, object code, formulae, descriptions, diagrams, computer architectures and structures, interfaces, screen displays, schematics, blueprints, flow charts, data, listings, processes, techniques, procedures, "know how," passwords and sign-on codes, documentation, manuals, specifications, designs, inventions, discoveries, improvements, research, development, marketing strategies, plans and materials, development plans, customer data and information, employee data, business, operational, customer, financial and technical information; business plans and forecasts; information about the Disclosing Party's products and services (e.g., launch and release dates; product development plans, new or improved features, technical architecture and system design; preliminary Software Releases, or Updates); or (b) is marked or designated by such party as "confidential" or "proprietary" at the time of disclosure. "Confidential Information" does not include information that: (w) was rightfully known to the party receiving such information ("Receiving Party") prior to its disclosure hereunder by the Disclosing Party; (x) is or becomes publicly available or is obtained lawfully from third parties without breach of any duty of confidentiality; (y) has been developed independently by the other party without reliance on such Confidential Information; or (y) is in possession of the other party prior to such disclosure, and is not subject to any confidentiality or nondisclosure obligations.

1.3     "Client Data" shall mean any data and information that Client provides, generates, transfers or makes available to Intuit, whether printed, electronic, or in some other format, and Client Data shall include data and information belonging to Client's customer.

1.4     "Consulting Services" shall mean services delivered by Intuit, or by a third party on Intuit's behalf, in the implementation of any Licensed Programs or NetSource Services delivered hereunder.

1.5     "Deliverable" shall mean the work product delivered or to be delivered by Intuit to Client in connection with its Consulting Services.

1.6     "Documentation" shall mean specifications, any user manuals, and other documents and materials

provided by Intuit to Client whether in printed or electronic form, and as may be updated by Intuit from time to time.

1.7     "Licensed Programs" shall mean those software programs as defined in Schedule A/A1, if applicable.

1.8     "NetSource Services" shall mean those hosted services provided by Intuit as defined in Schedule C/C1, if applicable.

1.9     "Project Plans" or "Statement of Work" ("SOW") shall mean any documented plans, proposals, work orders, or statements detailing work as agreed by Client and approved by Intuit in writing and appended to this Agreement by reference.

**2.     TERMS AND CONDITIONS.**

The parties acknowledge and agree that these terms and conditions shall apply to Licensed Programs and NetSource Services, as applicable, unless set forth in applicable schedules to this Agreement.

**3.     CONSULTING SERVICES.**

3.1     Consulting Services Generally. Intuit will provide Client with Consulting Services as set forth in the applicable Project Plans, Statements of Work or proposals approved by Intuit and Client and comprising Schedule 1 attached hereto ("Consulting Services and Fees Schedule and Statement of Work"). Intuit reserves the right to change the terms, conditions and pricing for its Consulting Services from time to time.

3.2     Project Plans/Proposals. Client and Intuit shall from time to time approve Project Plans that specify the Consulting Services to be provided to Client. All Project Plans shall be deemed part of and subject to this Agreement and must be signed by both parties. Such executed versions may be exchanged electronically such as by email and facsimile. Each Project Plan will include: (i) a description of the applicable Consulting Services, including any Deliverables; (ii) the schedule or timetable relating to the provision of such Consulting Services; (iii) the applicable fees and payment terms for such Consulting Services, if not elsewhere specified; and (iv) any other applicable terms and conditions relating to the Consulting Services.

3.3     Delivery of Consulting Services. Intuit will provide personnel to accomplish the tasks and objectives specified in the Project Plans at specified hourly rates, except as otherwise expressly agreed with Client. Consulting Services performed at Client's site shall be billed to Client in minimum increments of eight (8) hours per day. Fees payable for the Consulting Services are based on services provided during normal Intuit business hours, Monday through Friday, 8:00 a.m. - 7:00 p.m. local time (Intuit holidays excluded). Consulting Services provided by Intuit outside of normal Intuit business hours will be subject to a premium service charge established by Intuit from time to time. If Client cancels Consulting Services specified in an approved Project Plan less than two (2) weeks before the scheduled start date for such Services, Client shall pay twenty-five percent (25%) of the total estimated costs for Consulting Services scheduled for performance between one (1) to two (2) weeks of Intuit's receipt of Client's cancellation and fifty percent (50%) of any Consulting Services scheduled for performance within one (1) week of such receipt.

3.4     Payment of Fees and Expenses for Consulting Services. Unless otherwise set forth in the Project Plan, and subject to Sections 3.3 ("Delivery of Consulting Services") and 4.3 ("Payment"), Intuit shall invoice Client

for any Consulting Services specified in Client's Project Plans on a time and materials basis based on Intuit's actual hours worked. Client will also reimburse Intuit for any reasonable lodging and other travel related expenses incurred by Intuit in connection with the Consulting Services. Intuit will provide reasonable documentation for any such expenditure in excess of Seventy-Five Dollars ($75.00) or more upon request by Client. Intuit will submit invoices to Client when and as Consulting Services are delivered. If Client disputes, in good faith, all or any portion of an invoice for Consulting Services, Client must (i) notify Intuit within ten (10) days of its receipt of Intuit's invoice including a detailed description of and basis for the disputed items, and (ii) pay when due that portion of the invoice not in dispute. Both parties will use reasonable efforts to resolve the billing dispute within thirty (30) days of Intuit's receipt of Client's notification. If any amount remains disputed after such thirty (30) day period, Intuit shall thereafter be entitled upon seven (7)-days advance written notice to Client to suspend Intuit's performance of any further Consulting Services. Without limiting any other rights or remedies available to Intuit under this Agreement or in law or equity, Intuit may continue such suspension until Client's payment obligations are paid to a current basis.

3.5    Access to Facilities.    Client shall provide reasonable access to its facilities by Intuit Representatives (as defined in Section 7) performing services under this Agreement, who will observe Client's working hours, rules and regulations applicable to its facilities. Each party shall maintain a reasonable level of insurance to protect itself from property damage and personal injury claims and liabilities caused by its employees or representatives.

3.6    Client Data.    Client is responsible for the accuracy and completeness of its information and Client Data. Intuit's performance is dependent on Client's timely provision of accurate and complete resources and information, including but not limited to detailed, precise and clear specifications for any report design, third party interfaces, and database customizations. Client acknowledges that its inability or failure to timely provide such resources and information may affect Intuit's provision of the Consulting Services, and Intuit's performance obligations shall be adjusted to such extent. Intuit will use commercially reasonable efforts to convert the Client Data specified for conversion in any Project Plans based on Intuit's evaluation of Client's existing Data and systems, and subject to any key assumptions underlying Intuit's data conversion proposal.

3.7    Training.    Any training specified in a Project Plan shall be performed using a standard Intuit sample database that provides representative data necessary to use critical features and functions unless otherwise agreed to by Intuit in writing. Client may request a more personalized training database for an incremental fee payable to Intuit to prepare and install the data prior to the scheduled training dates. Unless Client otherwise explicitly contracts with Intuit to provide such services, or unless Client uses an Intuit training facility, Client is responsible for configuring the training environment to ensure that the Intuit software, training database (Intuit will provide the standard sample database prior to the training), seating, networking of desktops and other necessary preparations have been completed prior to the commencement of the scheduled training session.

3.8    Testing of Projects.    Client shall test any project elements involving report writing, third party interfaces or database customizations, and notify Intuit of all potential deficiencies relative to the applicable specifications for

such work within the thirty (30)-day Warranty Period (as defined below) after Intuit's Delivery (as defined below) of such project elements to Client. Subject to Client's timely notification, Intuit will re-perform the applicable Consulting Services required to meet the applicable specifications. Intuit reserves the right to charge Client for time and materials for any requested corrections, regardless of whether or not the corrections were within the scope of the original specifications, if Intuit receives such notification after the applicable thirty (30)-day Warranty Period.    Changes to specifications, whether before, during or after Intuit's performance of Consulting Services, will be processed through change orders and charged accordingly on a time and materials basis according to Intuit's then-current published rates.

3.9    Employment of Intuit Personnel.    Intuit has expended significant resources, time, effort and money to train and maintain its employees and consultants. Client agrees that, if it employs an Intuit employee or consultant within one (1) year after the date such Intuit employee or consultant ceased providing services to Client, then Client shall pay to Intuit an amount equal to two (2) times such Intuit employee's annual compensation, or Intuit consultant's most recent annual total consulting fees, within thirty (30) days of Client's hiring of such Intuit employee or consultant.

3.10    Customizations.    Customizations are designed to be compatible with Client's current version/release of any Licensed Programs or NetSource Services performed under this Agreement. Intuit reserves the right to charge Client for any reintegration work required to make customizations compatible with future versions/releases.

3.11    Client Responsibilities.    Client shall timely provide resources and perform tasks to support the implementation and use of any Licensed Programs or NetSource Services delivered under this Agreement, including but not limited to: designing a chart of accounts; defining master tables and structures; determining system flags and global tables; providing accurate and complete data; providing thorough, detailed and clear customization specifications, and competent, knowledgeable business resource liaisons; properly setting up training environment, databases and equipment; and, verifying and accepting electronically-converted data.    All Intuit estimates for Consulting Services are based on Client's timely and complete performance of its associated obligations.

4.    FEES AND PAYMENT.

4.1    Expenses and Costs.    In addition to any fees owed pursuant to this Agreement, Client shall reimburse Intuit for the following costs and expenses:  (i) shipping and delivery and transportation charges for all shipments of any software, documentation and supplies; (ii) reasonable out-of-pocket expenses incurred by Intuit in connection with the performance of any NetSource Services or Consulting Services, including, but not limited to, forms and supplies for use with specific applications (e.g., invoices, checks, etc.), and (iii) travel related expenses.

4.2    Taxes.    All fees and costs payable under this Agreement are net amounts and are payable in full, without deduction for taxes or duties of any kind. Client will be responsible for, and will promptly pay, all taxes and duties of any kind (including but not limited to sales, use and withholding taxes), if any, associated with this Agreement or Client's receipt or use of any Licensed Programs, NetSource Services, or related Consulting Services, except for taxes based on Intuit's net income. In the event that Intuit is required to collect or pay any

tax for which Client is responsible. Client will pay such tax directly to Intuit. If Client pays any withholding taxes that are required to be paid under applicable law, Client will furnish Intuit with written documentation of all such tax payments, including receipts.

4.3   Payment.   Client shall pay Intuit any fees or expenses due under this Agreement in U.S. currency in the amounts and at the times set forth in this Agreement, the Schedules and any applicable Project Plans or, if not indicated therein, within thirty (30) days of the date of Intuit's invoice. If Client pays any invoice by credit card, a two percent (2%) processing fee will be added by Intuit to the total amount due. If Client fails to timely pay any amount due under this Agreement, whether by acceleration or otherwise, Client, upon demand, shall pay, in addition, interest at the rate of one and one-half percent (1 1/2%) per month, but not to exceed the maximum allowed by law, on such delinquent amount from the due date thereof until the date of payment. Further, Client shall reimburse Intuit for any and all expenses that Intuit may incur (including interest, attorneys' fees and any expenses) in connection with Intuit's efforts to collect any amounts due to Intuit hereunder. All payments must be sent to: Intuit Inc., P.O. Box 51887, Los Angeles, CA 90051-6187, or such other location designated by Intuit.

5.   WARRANTY.

Intuit warrants that for a period of thirty (30) days (the "Warranty Period") following Delivery by Intuit to Client, any Licensed Program or NetSource Services will conform in all material respects with the applicable Documentation ("Warranty Criteria") provided to Client by Intuit. In the event that Client determines that any Licensed Program or NetSource Services as delivered to Client by Intuit fails to conform to the Warranty Criteria and Client delivers to Intuit notice of such failure within the Warranty Period (and such notice shall detail the specific non-conformities), Intuit shall repair or replace the specific non-conformities as soon as practicable at no additional charge to Client. The foregoing warranty states Client's sole and exclusive remedy, and Intuit's entire liability, with respect to the warranty. Intuit warrants and represents that it has tested the Licensed Programs and NetSource Services as delivered to Client, and to the best of its knowledge at the time of Delivery of such Licensed Programs or NetSource Services, the Licensed Programs or NetSource Services are free from viruses that might materially affect their performance or function. The foregoing warranty shall not apply to the extent that any Licensed Programs or NetSource Services, or any portion thereof, have been altered or modified in any way by any party other than Intuit.

6.   DISCLAIMER OF WARRANTIES.

EXCEPT AS EXPRESSLY PROVIDED IN SECTION 5 ABOVE, THIS AGREEMENT, ANY LICENSED PROGRAMS AND/OR NETSOURCE SERVICES, CONSULTING SERVICES, AND ANY RELATED SERVICES OR CONTENT ACCESSIBLE THROUGH THE LICENSED PROGRAMS OR NETSOURCE SERVICES, OR OTHER RELATED SERVICES, ARE PROVIDED "AS-IS," AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, INTUIT DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE LICENSED PROGRAMS, DISKS, NETSOURCE SERVICES, CONSULTING SERVICES, RELATED MATERIALS AND ANY RELATED SERVICES OR CONTENT, INCLUDING ANY IMPLIED WARRANTIES RELATING TO FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, NON-INFRINGEMENT OR TITLE, AND WARRANTIES ARISING FROM COURSE OF DEALING,

USAGE OR TRADE. INTUIT DOES NOT WARRANT THAT THE LICENSED PROGRAMS OR NETSOURCE SERVICES OR ANY RELATED SERVICES OR CONTENT ARE FREE FROM BUGS, ERRORS, OR OTHER PROGRAM LIMITATIONS NOR DOES INTUIT WARRANT ACCESS TO THE INTERNET OR TO ANY OTHER SERVICE OR CONTENT THROUGH THE LICENSED PROGRAMS, NETSOURCE SERVICES, OR OTHER RELATED SERVICES, OR THAT IT CAN CONVERT ALL OF CLIENT'S DATA. NO ADVICE OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED FROM INTUIT OR ELSEWHERE WILL CREATE ANY WARRANTY NOT EXPRESSLY STATED IN THIS AGREEMENT. CLIENT ACKNOWLEDGES THAT INTUIT AND ITS REPRESENTATIVES (AS DEFINED BELOW IN SECTION 7) ARE NOT RENDERING LEGAL, ACCOUNTING, REAL ESTATE (COMMERCIAL OR RESIDENTIAL) OR OTHER PROFESSIONAL ADVISORY SERVICES TO CLIENT. CLIENT IS RESPONSIBLE FOR KEEPING INFORMED OF CHANGES IN LAWS, REGULATIONS AND OTHER PRACTICES AFFECTING ITS BUSINESS.

7.   LIMITATION OF LIABILITY.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, INTUIT AND ANY OF ITS SUBSIDIARIES, AFFILIATES, LICENSORS, VENDORS, THIRD PARTY CONTENT OR SERVICE PROVIDERS, DEALERS OR SUPPLIERS ("REPRESENTATIVES") ARE NOT LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO: DAMAGES FOR LOSS OF BUSINESS, PROGRAM OR SYSTEM VIRUSES, LOST OR CORRUPTED DATA, LOSS OF PROFITS OR INVESTMENT, OR THE LIKE), WHETHER BASED ON BREACH OF CONTRACT, BREACH OF WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHERWISE, EVEN IF INTUIT OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND EVEN IF A REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE. THE LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN INTUIT AND CLIENT. CLIENT ACKNOWLEDGES THAT INTUIT WOULD NOT BE ABLE TO PROVIDE THE LICENSED PROGRAMS OR SERVICES ON THE TERMS AND CONDITIONS HEREIN WITHOUT SUCH LIMITATIONS. THE ENTIRE CUMULATIVE LIABILITY OF INTUIT AND ITS REPRESENTATIVES FOR ANY REASON UNDER THIS AGREEMENT SHALL BE LIMITED TO THE AMOUNT PAID BY CLIENT FOR ANY LICENSED PROGRAMS, MAINTENANCE SERVICES, NETSOURCE SERVICES, AND CONSULTING SERVICES PROVIDED BY INTUIT TO CLIENT OVER THE MOST RECENT TWENTY-FOUR (24) MONTH PERIOD. THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE THAT INTUIT HAS SET ITS PRICES AND ENTERED INTO THIS AGREEMENT IN RELIANCE UPON THE LIMITATIONS OF LIABILITY SPECIFIED HEREIN, WHICH ALLOCATE THE RISK BETWEEN INTUIT AND CLIENT AND FORM A BASIS OF THE BARGAIN BETWEEN THE PARTIES.

8.   TERM AND TERMINATION.

8.1   Term.   The "Term" of this Agreement shall commence on the Effective Date and shall continue unless terminated by either party in accordance with this Section 8 or as otherwise set forth in any Schedule under this Agreement.

8.2   Termination by Either Party.

8.2.1   Immediate Termination.   Either party may immediately terminate this Agreement if the other party: (i) becomes or is likely to become insolvent or subject to a bankruptcy proceeding (which, if involuntary, is not

discharged within thirty (30) days; (ii) suffers appointment of a receiver for any material portion of its assets or business, or of a conservator or liquidating agent; or (iii) makes an assignment for the benefit of creditors.

8.2.2   Termination for Breach.   Either party may terminate this Agreement upon thirty (30) days' written notice if the other party breaches this Agreement and fails to cure such breach within thirty (30) days after receiving written notice thereof from the non-breaching party.

8.2.3   Termination by Expiration.   This Agreement shall automatically expire, as may be applicable, upon (i) the termination of Client's license to use any Licensed Programs or clear evidence of Client's intention to cease using any Licensed Programs, including but not limited to Client's notification to Intuit of its intention to cease using the Licensed Programs, or (ii) the expiration or termination of Intuit's obligation to provide any Software Maintenance Services (as defined below); or (iii) the termination of Client's right to access any NetSource Services or clear evidence of Client's intention to cease access of NetSource Services, including but not limited to Client's notification to Intuit of its intention to cease using any NetSource Services.

8.2.4   Notwithstanding the decision of a party to terminate this Agreement, this Agreement shall remain in full force and effect until the termination or expiration of any effective addenda, at which time this Agreement shall terminate subject to Sections 8.3 and 8.4 hereunder.

8.3   Responsibilities Upon Termination.   Upon the termination or expiration of this Agreement, and without limiting any other provision hereof: (i) each party shall destroy the other party's Confidential Information, or return it at the other party's request and expense; (ii) Client shall pay to Intuit all accrued unpaid fees and expenses, including those relating to any Consulting Services or Software Maintenance Services performed prior to such termination or expiration (including any related expenses, and cancellation fees as set forth in Section 3.3 of the Agreement); (iii) any and all licenses granted under this Agreement shall immediately terminate; (iv) Client shall immediately cease its use of any NetSource Services; and (v) except in the event of insolvency of Client, Client shall, at Intuit's election, either promptly return to Intuit or destroy all Confidential Information, copies of any Licensed Programs, or third party software, if any, (including back-up copies), related Documentation, Deliverables, and all other work product and materials, whether tangible or intangible, furnished by Intuit pursuant to this Agreement.

8.4   Survival.   The following provisions of these Terms and Conditions, and applicable provisions as set forth in the Schedules, shall survive any expiration or termination of this Agreement and remain in effect until fulfilled: Sections 1 ("Definitions"), 3.4 ("Payment of Fees and Expenses for Consulting Services"), 3.9 ("Employment of Intuit Personnel"), 4 ("Fees and Payment"), 6 ("Disclaimer of Warranties"), 7 ("Limitation of Liability"), 8.3 ("Responsibilities Upon Termination"), 8.4 ("Survival"), 9 ("Ownership"), 10 ("Confidential Information"), and 11 ("General"), and any terms specifically described or otherwise included in any Schedules, Project Plans, or Statements of Work.

## 9.   OWNERSHIP.

9.1   Intellectual Property.   Client acknowledges and agrees that Intuit owns all right, title, and interest in and to: (i) any Licensed Programs (including any Intellectual

property rights arising from the parties' performance of this Agreement), NetSource Services, Consulting Services, Software Maintenance Services, Application and Technical Support Services, Deliverables (if any), related Documentation, enhancements, Updates, and all other proprietary work product or works of authorship developed by Intuit and furnished under this Agreement; and (ii) all copyrights, patents, trademarks, service marks, trade secrets, and other intellectual property rights relating thereto.   Client acknowledges and agrees that, except for the limited licenses expressly granted herein, nothing in this Agreement effects any transfer of any such rights, title or interest in or to the foregoing from Intuit to Client. Upon Intuit's request, Client agrees to execute such further instruments, and take such further actions as Intuit may reasonably request, at Intuit's expense, to apply for, register, perfect, confirm, and protect Intuit's rights.   Client shall reimburse Intuit for any and all expenses that Intuit may incur (including interest, attorneys' fees and other legal expenses) in connection with Intuit's efforts to enforce its rights against Client with respect to the Licensed Programs, NetSource Services, Consulting Services, Software Maintenance Services, Application and Technical Support Services, or any of Intuit's intellectual property rights in the event Intuit prevails in such enforcement efforts.

9.2   Client Data.   Client shall retain all right, title and interest in and to Client Data.

## 10.   CONFIDENTIAL INFORMATION.

10.1   Treatment of Confidential Information.   The Receiving Party shall not disclose Confidential Information or any reports from which any Confidential Information may be derived to any third party, except service providers acting on behalf of the Receiving Party and who shall be bound by an agreement with obligations of confidentiality at least as stringent as those contained in this Agreement, without the Disclosing Party's prior written consent, and shall only use Confidential Information as reasonably required to perform its obligations under this Agreement. The Receiving Party shall disclose Confidential Information only to those of its employees and agents who have a need to know such information and who are under an obligation to maintain the confidentiality of such information. The parties acknowledge that a breach of this Section 10 would cause irreparable harm to the Disclosing Party, which would not have an adequate remedy at law with respect to disclosure or threatened disclosure of the Confidential Information.   Therefore, in the event of a breach or threatened breach by the Receiving Party of such obligations, the Disclosing Party is entitled to seek the immediate issuance, without notice, hearing or bond, of a temporary restraining order precluding the continuance of the conduct in question by Receiving Party in addition to pursuing any other available legal or equitable relief.

10.2   Compelled Disclosure.   If the Receiving Party becomes legally compelled by court order or regulatory agency to disclose any Confidential Information, the Receiving Party shall, to the extent practicable, provide the Disclosing Party with written notice of such requirement prior to disclosure so that the Disclosing Party has the opportunity to seek a protective order or other appropriate remedy.   The Receiving Party shall furnish only that portion of the Confidential Information that the Receiving Party is legally required to furnish and shall reasonably cooperate with the Disclosing Party in seeking assurances that confidential treatment will be accorded such Confidential Information.

**10.3  EU and Canadian Client Data.** If Client provides personal data to Intuit from data subjects in Canada or the European Union ("EU"), then Client hereby (a) acknowledges that in connection with any products or services provided by Intuit under this Agreement, Intuit may transfer/access/store/process personal data outside of the EU and Canada in countries (such as the United States) that under EU laws may not ensure an adequate level of data protection (the "Data Transfer"); and (b) consents to such Data Transfer, and Client shall ensure that it complies with all applicable EU and Canadian laws that apply to Client as the data controller of such personal data in connection with the Data Transfer. Intuit will take reasonable measures to protect the security of such personal data transferred by Client to Intuit.

**11.  GENERAL.**

**11.1  Complete Agreement.** Client acknowledges that this Agreement is a complete statement of the agreement between it and Intuit with respect to any Licensed Programs, NetSource Services, Consulting Services, Application and Technical Support Services, or Software Maintenance Services, and that there are no other prior or contemporaneous understandings, promises, representations, or descriptions relating to the subject matter hereof. Additionally, except as otherwise expressly agreed to by Intuit, any additional or different terms in Client's communications, such as in preprinted terms and conditions on purchase orders, acknowledgments or invoices, are hereby deemed to be material alterations and notice of objection and rejection of them is hereby given. In the event of any irreconcilable conflict between the terms in this Agreement and those in the cover page or any Schedule, Project Plan or Statement of Work to the Agreement, the terms in the cover page, Schedule, Project Plan or Statement of Work shall prevail to the extent necessary to resolve such conflict. The headings in these Master License and Services Agreement terms and conditions are inserted solely as a matter of convenience and for reference, and shall not be considered in the construction or interpretation of any provision hereof. Unless the context otherwise specifically requires, all references to Section (e.g., Section 8) of this Agreement shall refer to all major and minor Sections (e.g., Section 8.1, 8.2, etc.) thereunder. This Agreement shall be interpreted as to its fair meaning, and shall not be strictly construed against either party, regardless of the actual drafter of the Agreement. The terms of this Agreement shall only be modified or waived in a writing signed by an authorized officer or employee of each party or of the party to be charged, respectively.

**11.2  Third Party Providers.** Intuit reserves the right to use a third party to host its software applications and services from time to time.

**11.3  Third Party Programs.** Except as may be provided in this Agreement, any Licensed Programs or NetSource Services, or other services provided hereunder, do not include any third party programs licensed to Client through Intuit. Any third party software programs are licensed to Client subject to the terms, conditions and warranties of the applicable license or sale agreement provided by the applicable vendor of such programs. For third party programs as may be included in any Licensed Programs, or NetSource Services, or Consulting Services under this Agreement, and as selected by Client, such third party license agreements may be attached and incorporated in applicable schedules to this Agreement. Assent by Client to this Agreement shall be deemed assent to such third party license agreements. Additionally, unless otherwise expressly provided in the applicable schedules, any software maintenance services and consulting services for third party programs must be separately contracted for by Client with the applicable vendor and are not covered by this Agreement.

**11.4  Publicity.** Neither party shall use the name of the other party in any publicity without the prior written approval of the other party, which approval shall not be unreasonably withheld. Each party shall complete its review of any proposed materials or activities submitted by the other party within five (5) business days of its receipt of such materials from the other party. Client approves and agrees it will participate in a joint press release within thirty (30) days of the execution of this Agreement.

**11.5  Anti Bribery/Anti-Corruption.** Client agrees to fully comply with the provisions of the United States Foreign Corrupt Practices Act ("FCPA") and/or the Organization for Economic Cooperation and Development ("OECD") prohibiting foreign bribery and improper payments. Without limiting the generality of the foregoing, Client represents and warrants that it has not and shall not at any time during the Term of the Agreement pay, give, or offer or promise to pay or give, any money or any other thing of value, directly or indirectly, to or for the benefit of: (i) any government official, political party, or candidate for political office; or (ii) any other person, firm, corporation or other entity, with knowledge that some or all of that money or other thing of value will be paid, given, offered or promised to a government official, political party or candidate for political office, for the purpose of obtaining or retaining any business, or to obtain any other unfair advantage, in connection with Intuit's business.

**11.6  Relationship.** Each party hereto is an independent contractor, and neither party is, nor will claim to be, a legal representative, partner, franchisee, agent or employee of the other. This Agreement sets forth Intuit's and its Representatives' entire liability and Client's exclusive remedies relating to this Agreement, any Licensed Programs, any Software Maintenance Services, any NetSource Services, or any Consulting Services provided to Client under this Agreement. Intuit shall not be responsible for an inability to perform under this Agreement caused by circumstances beyond its reasonable control. Client's use of any third party's services or content accessed through the Licensed Programs, NetSource Services, Consulting Services, and Software Maintenance Services shall be governed by any agreement entered into between Client and such third party, and Intuit shall have no liability relating thereto. This Agreement (and each warranty contained herein) is made and entered into for the sole protection and benefit of the parties hereto (including Intuit's Representatives), and no other person or entity shall be a direct or indirect beneficiary of, or shall have any direct or indirect cause of action or claim in connection with this Agreement.

**11.7  Governing Law.** This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. The validity and performance of this Agreement shall be governed by Massachusetts law (without regard to its choice of law principles). The application to the Agreement of the United Nations Convention on Contracts for the International Sale of Goods is hereby expressly excluded. All rights under this Agreement are cumulative, and this Agreement does not limit any rights that Intuit may have under trade secret, copyright, patent or other laws. If any provision of this Agreement is invalid or unenforceable under applicable

law, then it is, to that extent, deemed omitted and the remaining provisions will continue in full force and effect. Each party waives its right to a jury trial in any litigation.

11.8   Assignment.  Client shall not assign, sublicense, delegate or transfer all or any portion of its rights or responsibilities under this Agreement by operation of law or otherwise, and any attempts to do so shall be void and constitute a material breach of this Agreement.  Intuit may assign, sublicense, delegate or transfer all or any portion of its rights or responsibilities under this Agreement by operation of law or otherwise to any subsidiaries or affiliates thereof, or to any other party in connection with a sale of this business.  Any assignment of this Agreement by Intuit in connection with a sale of this business shall relieve Intuit from any further liability hereunder.  All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties, their successors and permitted assigns.

11.9   Notices.  Except as otherwise specified herein, all notices, demands or communications required hereunder shall be in writing and delivered personally, or sent either by U.S. certified mail, postage prepaid return receipt requested, or by overnight delivery air courier (e.g., Federal Express) to the parties at their respective addresses set forth above in this Agreement and, for Intuit, with a copy to:  Intuit Inc., Attention: General Counsel, Law Department, P.O. Box 7850, Mountain View,

California 94039-7850.   All such notices, requests, demands, or communications shall be deemed effective immediately upon receipt  The parties shall change their respective addresses for notification on five (5) days advance written notice pursuant to the procedures set forth in this Section 11.9.

11.10   Export Controls.  Client acknowledges and agrees that the Licensed Programs are subject to restrictions and controls imposed by the United States Export Administration Regulations (15 C.F.R. Chapter VII), and Client agrees it will comply with these regulations.  Client further agrees that neither the Licensed Programs nor any direct product thereof will be exported or re-exported, directly or indirectly, to (i) any countries which are subject to U.S. export restrictions; (ii) any end user who has been prohibited from participating in United States export transactions by any federal agency of the United States government; or (iii) any end user who Client knows or has reason to know will utilize them in the design, development or production of nuclear, chemical or biological weapons.  Client further acknowledges that the Licensed Programs may include technical data subject to export and re-export restrictions imposed by United States law.

## Schedule "A"

### User Licensed Programs and Fees Schedule

| User Licensed Programs | |
|---|---|
| **Intuit User Licensed Programs** *(specify below)*<br>Residential Management<br>Residential Management Electronic Lockbox<br>Facility Management<br>Accounts Payable<br>General Ledger<br>ReportDesign<br>WebDesign<br>Advanced User Security<br>Virtual Site (Includes Distributive Processing)<br>1 SQL Database | $28,105 |
| **x  Access 24/7 Resident Portal** *(specify below)*<br>        X   Resident Portal Only<br>        Total # of Units:  _2,000_<br><br>**Note:** Access 24/7 requires use of 4.0 or later version of the Licensed Programs; Microsoft Internet Explorer 5.0 or later; NetScape Web Browser/Communicator 6.0 or later; End users must use Microsoft Windows 06 platform version 2000 or later; Internet access is required to use Access 24/7, for which Client and not Intuit shall be solely responsible for installation, implementation and maintenance. Intuit provides support solely to Client, and not to Client's residents, in accordance with the Agreement. | $14,000 |

| | | | |
|---|---|---|---|
| **X  Intuit Licensed Programs Standard Edition, and User Specifications** *(specify below)*<br><br>____ **Enterprise Edition** (see notes below)<br>   •   Number of "concurrent active" users      ____   @ $3,125 per user<br>   •   Number of "named active" users               @ $1,560 per user<br><br>___x___ **Standard Edition** (see notes below)<br>   •   Standard Edition includes one (1) concurrent active user<br>   •   ___x___   Initial four (4) "concurrent active" users network $2,600<br>   •   Number of _additional_ concurrent active users 11@ $1,040 per user | | | $14,040 |
| **☐ Third Party Software Programs** *(specify below):*<br>None [Or, specify module, if any] | | | |
| | | Total License Fees | $56,145 |
| | | Competitive Adjustment Expires July 31, 2009 | ($15,945) |
| | | Total Adjusted License Fees | $40,200 |
| | | 50% Deposit Payment Due upon Effective Date of Agreement | $20,100 |
| | | Balance Invoiced upon Delivery of Licensed Programs | $20,100 |
| | | **Initial Payment Required**<br>*(Includes, as applicable, 50% license fees, 100% of Shipping and Handling fees, 100% of e-Learning setup fees, , 100% of Maintenance Services Fees, and 100% of Application and Technical Support Services fees)* | $28,077 |

**1.    NOTES.**

1.1    Intuit Standard and Enterprise Editions have different hardware requirements.

1.2    The Intuit Standard Edition is limited to two hundred fifty (250) active commercial leases and/or three thousand (3,000) active residential units.

1.3    User License Types:

1.3.1    A "concurrent active" user license permits Client to assign an unlimited number of User IDs to its employees, but simultaneous access to the Licensed Programs is limited to the number of authorized concurrent licenses paid for and held by the Client.

1.3.2    A "named active" user license permits Clients to assign User IDs only to a fixed number of specifically named employee users, and simultaneous access to the Licensed Programs is limited to those specific named users.

1.5    Location of Client installation of Licensed Programs: 60 Leo Birmingham Parkway, Brighton, MA 02135

**2.    DEFINITIONS (as applicable).**

2.1    "Client-Generated Error" shall mean any problem in the operation or performance of the Licensed Programs caused by any of the following: (i) non-Intuit software or hardware products, or use of the Licensed Programs in conjunction therewith, not expressly authorized by Intuit in writing; (ii) modifications to the Licensed Programs made by any party not approved by Intuit and without Intuit's express written authorization; (iii) Client's use of the Licensed Programs other than as authorized in this Agreement or as provided in the Documentation; (iv) Client's use of other than the most current or one (1) previous version of the Licensed Programs, including any error corrections or Updates or

Upgrades thereto made available by Intuit, or (v) Client, or a third party not expressly authorized by Intuit in writing, installing or implementing the Licensed Programs without Intuit's recommended training or otherwise doing so improperly.

2.2     "Delivery" shall mean the date that Intuit (i) delivers those Licensed Programs specified in this Schedule A, as contained on physical media, and as delivered by Intuit employee, to Client, (ii) delivers such Licensed Programs, as contained on physical media, to a common carrier for shipment to Client, or (iii) makes such Licensed Programs available for electronic download by Client, whichever such date shall occur earliest.

2.3     "Licensed Programs" shall mean the machine-readable, object code version software as specified in this Schedule A, including any Updates and Upgrades thereto that Intuit delivers to Client hereunder.

2.4     "Software Release" shall mean a version of the Licensed Programs, as designated by X.X.

2.5     "Upgrade" shall mean a new Software Release of the Licensed Programs that may contain (i) new applications; (ii) major functionality enhancements or improvements; and/or (iii) a new platform, and which are designated by an incremental increase in the release number to the left of the decimal point (by way of example only, release 2.0 designates an Upgrade from release 1.0).

2.6     "Update" shall mean a new Software Release of the Licensed Programs that may include bug fixes, patches, error corrections, non-new platform changes, or minor modifications or revisions to the Licensed Programs that enhance existing performance, and which are designated by an incremental increase in the release number to the right of the decimal point (by way of example only, release 2.1 designates an Update from release 2.0). Update shall not mean Upgrades or new derivations of the Licensed Programs for which Intuit charges a separate license fee, or new products whose name is different from that of the Licensed Programs. Updates may be provided to Client through electronic download.

3.      **LICENSE GRANT & RESTRICTIONS.**

3.1     License Grant.  Subject to the terms of this Agreement, including without limitation the payment of the license fees for the Licensed Programs as set forth in this Schedule A, Intuit grants to Client a limited, perpetual (except in the event that such license is terminated in accordance with Section 8 ("Termination") in the Agreement), non-exclusive, non-sublicenseable, and non-transferable license to (i) install and use a single copy of the Licensed Programs on its internal business computer system at the location specified in this Agreement and only to conduct its internal business operations for the number and type of users specified in this Schedule A, and (ii) make not more than three (3) additional copies of the Licensed Programs as reasonably required for back-up, training or development purposes. The Licensed Programs are protected by copyright law, and Client shall include and not delete or otherwise alter on any authorized copies of the Licensed Programs any copyright notices or other proprietary legends included or specified by Intuit.

3.2     Restrictions.  Other than as expressly permitted by Intuit in writing or as set forth in Section 2.1 of this Schedule A, Client shall not: (i) make or distribute additional copies of the Licensed Programs or enable others to access or use its license(s), license keys, registration code(s) or serial number(s), if any; or, (ii) provide access to the Licensed Programs for more than the number and types of users for which it has paid Intuit. The Licensed Programs contain Intuit trade secrets, and Client shall not decompile, reverse engineer, disassemble, or otherwise reduce the Licensed Programs to human-perceivable form, disable any functionality which limits the use of the Licensed Programs, or use such trade secrets to develop software to interface with the Licensed Programs or otherwise.  Client shall not modify, adapt, translate, rent or sublicense (including offering to or using the Licensed Programs on behalf of third parties on an applications service provider, service bureau, outsourcing, subscription, time-sharing or other similar basis), assign, loan, resell, or distribute the Licensed Programs, disk(s), or related materials or create derivative works based upon the Licensed Programs or any part thereof.

4.      **DELIVERY.**  Client is solely responsible for acquiring and maintaining all computer hardware, software, electrical power, connections and the appropriate network and systems environment to support the installation and use of the Licensed Programs. Client is responsible for implementing procedures to maintain the security and daily back-up of information stored or used by the Licensed Programs, and to protect against viruses.

5.      **WARRANTY OF MEDIA.**  In addition to any foregoing warranty, Intuit warrants that the media on which the Licensed Programs are delivered will be free of defects in material and workmanship. Intuit will promptly replace any media containing the Licensed Programs that fails to meet this warranty.

6.      **INFRINGEMENT INDEMNITY.**  Intuit will defend and indemnify Client against any action brought against Client by a third party to the extent that it is based upon a claim that a Licensed Program, as provided by Intuit to Client under this Agreement and used within the scope of this Agreement, infringes any U.S. copyright, trademark or trade secret, and will pay any costs, damages and reasonable attorneys' fees attributable to such claim that are awarded either by final judgment or settlement against Client, provided that Client: (a) promptly notifies Intuit in writing of the claim; (b) grants Intuit sole control of the defense and settlement of the claim; and (c) provides Intuit, at Intuit's expense, with all assistance, information and authority reasonably required for the defense and settlement of the claim.  If Client's use of any of the Licensed Program hereunder is, or in Intuit's opinion is likely to be, enjoined due to such type of claim, Intuit may, at its sole option and expense: (i) procure for Client the right to continue using such Licensed Program under the terms of this Agreement; (ii) replace or modify such Licensed Program so that it is non-infringing and substantially equivalent in function to the enjoined Licensed Program; or (iii) if options (i) and (ii) above cannot be accomplished despite Intuit's reasonable efforts, then Intuit may terminate Client's rights and Intuit's obligations hereunder with respect to such Licensed Program and refund to Client the unamortized portion of the software license fees paid for such Licensed Programs, based upon a straight-line five (5) year depreciation schedule commencing as of the date of Delivery to Client of such Licensed Program and any pre-paid fees for Consulting Services (as defined in Section 3.1 ("Consulting Services Generally") of the Terms and Conditions) not yet rendered by Intuit.  Notwithstanding the foregoing, Intuit will have no liability for any infringement or misappropriation claim of any kind to the extent that it results from: (v) modifications to

the Licensed Program made by a party other than Intuit or its agents, if a claim would not have occurred but for such modifications; (w) the combination, operation or use of the Licensed Program with equipment, devices, software or data not supplied by Intuit or specified in the Documentation, if a claim would not have occurred but for such combination, operation or use; (x) Client's failure to use an updated or modified Licensed Program provided by Intuit to avoid a claim; (y) Intuit's compliance with any designs, specifications or plans provided by Client; or (z) Client's use of a Licensed Program other than in accordance with this Agreement or the Documentation. The provisions of this Section 6 set forth Intuit's sole and exclusive obligations, and Client's sole and exclusive remedies, with respect to infringement or misappropriation of intellectual property rights of any kind by the Licensed Programs.

## 7.    SOFTWARE MAINTENANCE SERVICES.

7.1    <u>Software Maintenance Services</u>.  Intuit provides software maintenance services ("Software Maintenance Services") pursuant to various Intuit maintenance plans, the current versions of which are described in Schedule B ("Software Maintenance and Application and Technical Support Services and Fees Schedule").  Intuit reserves the right to change the terms, conditions, features and pricing of its Software Maintenance Services plans from time to time.  Subject to Client's timely payment of applicable maintenance fees, as set forth in Schedule B, Intuit will provide to Client the Software Maintenance Services for the maintenance plan selected by Client and indicated in the Software Maintenance Schedule during the specified period.

7.2    <u>Software Maintenance</u>.  Software Maintenance Services are provided for twelve (12) calendar month periods, defined as a "Maintenance Period."  Intuit provides software maintenance for the current Software Release of the Licensed Programs and one (1) previous Software Release.  Clients who are current in their payments for their specified maintenance plan are entitled to receive Updates to the Licensed Programs as Intuit makes such Updates generally available to its other customers under that same maintenance plan.  Clients who are current in their payments for their specified maintenance plan are entitled to receive Upgrades to the Licensed Programs free of charge, if, and as, such are made generally available, free of charge, by Intuit to its other clients.

7.3    <u>Software Maintenance Renewal</u>.  Prior to the end of the Maintenance Period, Intuit will send an invoice to Client for renewal of the Software Maintenance Services.  Timely payment of such invoice shall renew the Maintenance Period as of its anniversary date.  Notwithstanding Client's right to use the Licensed Programs in accordance with the license granted under this Agreement, Client's failure to timely pay such invoice shall terminate Intuit's obligation to provide the Software Maintenance Services in the subsequent Maintenance Period and subjects Client to higher technical support hourly rates if Client calls for such support as compared to customers with paid maintenance plans. Following the initial Maintenance Period, Intuit reserves the right to increase the price for Software Maintenance Services.

7.4    <u>Reinstatement After Termination</u>.  To reinstate Software Maintenance Services that previously expired or terminated, Client must first pay (i) all amounts for Software Maintenance Services for previously unpaid time periods at Intuit's then-current rates, and (ii) any applicable Software Maintenance Services fees for the applicable renewal period. Notwithstanding the foregoing, in the event Client does not renew Software Maintenance Services under Section 7.3 above for a given Maintenance Period, or does not otherwise pay to Intuit the Software Maintenance Services fees specified herein, (i) Intuit is not obligated to provide such Software Maintenance Services to Client during that Service Year or for any Maintenance Period thereafter; and (ii) Application and Technical Support Services rates may increase in accordance with Schedule B.

## 8.    APPLICATION AND TECHNICAL SUPPORT SERVICES.

8.1    <u>Application and Technical Support Services</u>.  Intuit provides software and application technical support services ("Application and Technical Support Services"), subject to receipt of Client payment, and in accordance with Schedule B ("Software Maintenance Services and Application and Technical Support Services and Fees Schedule").

8.2    <u>Licensed Program Support</u>.  Intuit may publish guidelines for the use of its Application and Technical Support Services from time to time, including the termination of Application and Technical Support Services for past versions of Intuit software applications.  Client is responsible for paying for technical support time requested  on its behalf in accordance with the applicable maintenance plan, and should limit such requests to persons who are qualified to use and reasonably familiar with the operation of the Licensed Programs.  Client shall promptly notify Intuit of any problems or errors with the Licensed Programs (including a detailed description of such errors), and shall answer questions and reasonably assist Intuit in its efforts to duplicate any such errors or problems, provided that Intuit will be under no obligation of any kind to provide Application and Technical Support Services of any kind to correct any errors that cannot be reproduced or verified by it within a reasonable period of time or for problems in the operation or performance of the Licensed Programs that are caused by a Client-Generated Error.  If Intuit determines that it is necessary to perform Application and Technical Support Services for a problem in the operation or performance of the Licensed Programs caused by a Client-Generated Error, then Intuit will notify Client thereof as soon as Intuit is aware of such Client-Generated Error and Intuit will have the right to invoice Client at Intuit's then-current published time and materials rates for all such Application and Technical Support Services.

8.3    <u>Service Year</u>.  Application and Technical Support Services are provided for twelve (12) calendar month periods, defined as a "Service Year."  Subject to receipt of payment from Client as specified herein, the Initial Service Year will commence upon the Delivery of the Licensed Programs and will terminate twelve (12) full calendar months thereafter.

8.4    <u>Renewals</u>.  Prior to the end of each Service Year, Intuit shall send an invoice for Application and Technical Support Services to Client.  Timely payment of such invoice shall renew the Service Year as of its anniversary date. Client's failure to timely pay such invoice shall terminate Intuit's obligation to provide the Application and Technical Support Services in the subsequent Service Year and subjects Client to higher technical support hourly rates if Client calls for such support as compared to customers with paid maintenance plans, and in such event, Client will receive Application and Technical Support at the basic support level, as designated by Intuit from time to time. Following the initial Service Year, Intuit reserves the right to increase the price for Application and Technical Support Services.

**9.** **GOVERNMENTAL LICENSES.** The Licensed Programs are a "commercial item," as that term is defined at 48 C.F.R. 2.101 (OCT 1995), consisting of "commercial computer software" and "commercial computer software documentation," as such terms are used in 48 C.F.R. 12.212 (SEPT 1995).  Consistent with 48 C.F.R. 12.212 and 48 C.F.R. 227.7202-1 through 227.7202-4 (JUNE 1995), any and all U.S. Government End Users acquire the Licensed Programs with only those rights set forth herein.

**10.** **SURVIVAL.** In addition to the provisions included in Section 8.4 ("Survival") of the Agreement, the following provisions in this Schedule A ("Licensed Programs and Fees Schedule") shall survive any expiration or termination of the Agreement and shall remain in effect until fulfilled:  Section 1 ("Definitions"), Section 2.2 ("Restrictions"), and this Section 10 ("Survival").

### Schedule "B"
### Software Maintenance Services
### and
### Application and Technical Support Services and Fees Schedule

| Annual Software Maintenance Services and Fees Schedule (15%*) | |
|---|---|
| Software Maintenance Services Schedule (indicate Maintenance Plan choice below) | |
| Summary of Initial Maintenance Period Software Maintenance Services Fee [a] | $7,957 |
| Full payment of the Software Maintenance Services Initial Maintenance Period fees[1] is due upon the Effective Date of this Agreement | $7,957 |

[1]   The Software Maintenance Services Initial Maintenance Period fee includes only the annual Software Maintenance Services Fee.  The annual prepaid Support Fee for any prepaid support as listed below.  Additional fees shall be charged for non-prepaid support.

*   The Annual Software Maintenance Fee is calculated each Service Year as a percentage of the then current list price for the then current Software Release of the Licensed Programs licensed by Client as set forth on Schedule A/A1, for the number and type of users and/or leases and residential units licensed by Client.  If the parties add additional Licensed Programs to Schedule A/A1 during the Term or increase the number and/or type of Users/Leases/Units licensed by Client, then as of the date of any such additions, Client shall pay the applicable Annual Software Maintenance Fee percentage and Annual Applications and Technical Support Services Fees for such additional Licensed Programs and/or Users/Units, pro-rated if applicable, through the end of the then current Service Year, and as of each Service Year thereafter.

| Annual Application and Technical Support Services and Fees Schedule |
|---|
| Application and Technical Support Services Schedule (indicate Support Plan choice below)<br>   X   Bronze<br>___ Silver<br>___ Gold<br>___ Platinum Lite<br>___ Platinum |

#### Application and Technical Support Services SLAs

| | Bronze | Silver | Gold | Platinum Lite | Platinum |
|---|---|---|---|---|---|
| Response time? | • Live response to phone calls<br>• Four (4)-hour response to e-mails | | • Two (2)-hour response (phone, e-mail and cases submitted online)<br>• Single point of contact managing 10-15 clients | • Ninety (90)-minute response (phone, e-mail and cases submitted online)<br>• Dedicated agent serving two (2) clients | • One (1)-hour response (phone, e-mail and cases submitted online)<br>• Dedicated agent serving one (1) client |
| How many contacts can call for support? | • All users call IRES directly | | • Four (4) authorized callers | • All users call IRES Directly | • All users call IRES Directly |
| Product application | • Standard implementation of product<br>• Basic to intermediate functionality<br>• Small number of user sites<br>• Simple setups | | • Highly customized implementation of product<br>• Complicated accounting structure<br>• Internal MRI help desk<br>• Custom internal process controls or policies affecting multiple sites | | |

**Application and Technical Support Plan Features and Pricing**

| Application and Technical Support Plans | | | | | | |
|---|---|---|---|---|---|---|
| | **No SMA** | **Bronze** | **Silver** | **Gold** | **Platinum Lite** | **Platinum** |
| Prepaid support time included [1] | | None | 2400 Minutes | 3300 Minutes | 1/2 Dedicated agent | One (1) full time dedicated agent |
| Annual support fee | | None | $4,500 | $15,000 | $80,000 | $140,000 |
| Support coverage | Same as Bronze / Silver | 8 a.m. – 8 p.m. day in Eastern Time or Eastern Daylight Time as applicable | | 8 hours per day in agreed time zone | | |
| Support [2]<br>• Current product<br>• Outdated product | $350/hour<br>$350/hour | $130/hour<br>$200/hour | | $195/hour<br>$275/hour | $195/hour<br>$195/hour | N/A<br>N/A |
| | | All plans offer Client Site access, including use of the KnowledgeBase, Wiki and online support case submission and tracking. | | | | |

[1]    Support is billable in ten (10)-minute increments.

[2]    Includes current Software Release and the most recent prior Software Release.

Schedule "F"

Client Contact Listing

*Client must complete the following information at the time of execution of this Agreement.*

**SHIPPING**
Address: 60 Leo Birmingham Parkway
City, State, ZIP: Brighton, MA 02135
Contact Name: Mr. Edward Saab
Contact Title: CPA
Contact Phone: 617.783.1024
Contact E-Mail: Esaab@the samiacompanies.com

**LICENSE/TECHNICAL UPDATES**
Address: 60 Leo Birmingham Parkway
City, State, ZIP: Brighton, MA 02135
Contact Name: Mr. Edward Saab
Contact Title: CPA
Contact Phone: 617.783.1024
Contact E-Mail: Esaab@the samiacompanies.com

**BILLING**
Address: 60 Leo Birmingham Parkway
City, State, ZIP: Brighton, MA 02135
Contact Name: Mr. Edward Saab
Contact Title: CPA
Contact Phone: 617.783.1024
Contact E-Mail: Esaab@the samiacompanies.com

**ONGOING COMMUNICATION/ADDITIONAL CONTACTS**
Address: 60 Leo Birmingham Parkway
City, State, ZIP: Brighton, MA 02135
Contact Name: Mr. Edward Saab
Contact Title: CPA
Contact Phone: 617.783.1024
Contact E-Mail: Esaab@the samiacompanies.com

**SOFTWARE MAINTENANCE**
Address: 60 Leo Birmingham Parkway
City, State, ZIP: Brighton, MA 02135
Contact Name: Mr. Edward Saab
Contact Title: CPA
Contact Phone: 617.783.1024
Contact E-Mail: Esaab@the samiacompanies.com

**ONGOING COMMUNICATION/ADDITIONAL CONTACTS**
Address: 60 Leo Birmingham Parkway
City, State, ZIP: Brighton, MA 02135
Contact Name: Mr. Edward Saab
Contact Title: CPA
Contact Phone: 617.783.1024
Contact E-Mail: Esaab@the samiacompanies.com

Schedule "I"

Consulting Services and Fees Schedule

And Statement of Work

Intuit Real Estate Solutions
Proprietary and Confidential



## Intuit Global Professional Services
## Work Authorization 26601
## Prepared for Samia Companies, LLC
## 7/30/2009

### Introduction

This Work Authorization is a part of and incorporated into the Agreement ("**Agreement**"), between Intuit Inc. ("**Intuit**") and Samia Companies, LLC ("**Client**"). Capitalized terms not defined in this Statement of Work are as defined in the Agreement. In the event of any conflict between the Agreement and this Work Authorization, the terms of the Agreement shall govern.

Client hereby acknowledges that the above Work Authorization accurately reflects the terms of the work agreed upon by Client and Intuit Inc. Intuit Inc. will notify Client of any out-of-scope work Intuit Inc. identifies, discuss any related changes to this Work Authorization with Client, and obtain Client's authorization to proceed with any additional work.

### Project Scope

This work authorization is for the implementation of the MRI solution. This estimate assumes the Client project team will assume ownership of managing the implementation project. The Intuit project team will provide guidance on solution design and provide instruction on database setup. The scope of the implementation estimate includes the following applications:

- General Ledger
- Accounts Payable
- Residential Management
- Facility Management
- Resident Portal

### Project Tasks and Deliverables (RM, AP, GL Implementation)

Residential Management, Accounts Payable, and General Ledger Implementation Tasks and deliverables:

- Project kick off meeting
- Remote product installation assistance
- Onsite Product Immersion training
- Onsite Solution design workshop
- Database mapping workshop – AP/GL
- Pilot data import – AP/GL
- Database setup workshops:
    o Global and master tables
    o Data entry
    o Residential Management
- Live data conversion – AP/GL data
- Configuration of the RM to GL interface chart
- One end-user training class delivery on each of the following applications:
    o General Ledger
    o Accounts Payable
    o Residential Management
    o Facility Management

Intuit Real Estate Solutions
Proprietary and Confidential

**INTUIT**

- One day of go-live support

**Resident Portal Project Tasks and Deliverables**

- Work break down structure detailing the specific project tasks, task durations and resource(s) assigned.
- Team kickoff meeting
- An application immersion training session that will re-orientate the members of the project team with the base functionality of the product.
- Solution design workshop to discuss how specific database configuration options will solve for the needs identified in the business requirements meeting.
- Solution design document detailing the configuration decisions for the base MRI Application to meet the client's requirements
- Application Security configuration needs defined for pilot users
- Assistance with definition of the user acceptance testing plans
- Initial load of global table information for one pilot property
- One pilot knowledge transfer session complete for client project team and pilot users
- Assistance with the validation of pilot property
- A production ready Access 24/7 application, installed and configured within the client's environment, which meets the agreed upon business requirements and specifications
- Completion of final data setup and validation tasks for one property
- One end-user training delivery complete for:
  - o   Resident Portal
  - o   System Administrator

**Project Assumptions**

- Project duration is estimated at two (2) months.
- Hardware will be unboxed, racked and the operating system software installed prior to the scheduled MRI software installation assistance appointment.
- Client will implement Residential Management for the Web and Accounts Payable and General Ledger for Windows.
- This offering includes the implementation of standard market rent apartments that will be processed centrally by the client's home office staff.
- The one (1) day product immersion session and a (2) two day solution design workshop will be completed onsite.
- Integrations to third party solutions are not within the scope of this project.
- End user training will be delivered onsite.
- Go live support will be scheduled in 8-hour increments if delivered onsite and 4-hour increments if delivered remotely.

**General Assumptions**

Unless otherwise requested and agreed to:

- Once this Work Authorization is signed and returned, the assigned Intuit Inc. Professional Services Consultant will be scheduled with project personnel at a mutually agreeable timetable.
- Any effort around change management/leadership program, business process reengineering, or project management of client resources is considered out of scope.
- Mutually agreed changes to specifications, whether before, during or after Intuit Inc.'s performance will be handled by processing a Project Change Request (PCR).
- When Client wishes to schedule onsite services, Client will give Intuit up to two (2) weeks prior notice so that the solution instructor can make appropriate travel arrangements.

Intuit Real Estate Solutions
Proprietary and Confidential



- Intuit reserves the right to charge Client a cancellation fee in accordance with the Agreement.
- Client shall make reasonable business efforts to deliver a stable network and computing environment prior to any services engagement.
- Client will work with Intuit Inc. to resolve all issues related to the project in a timely fashion.
- Client will communicate to Intuit Inc. any changes in schedule, availability of project personnel, hardware, software, resources or facilities related to the project within a reasonable timeframe in advance of scheduled engagements.
- Client will manage the availability of appropriate personnel for knowledge transfer as well as decision-making and escalation of decisions.
- Intuit reserves the right to adjust the project plan based on real world findings and the client's ability to secure required resources.
- Location of work will be discussed and determined mutually between both parties.

**Database Conversion Assumptions**

- Accounts Payable and General Ledger data will be imported into the MRI system by and Intuit Conversion resource.
- The Client is responsible for:
  - Extraction of data from source system
  - Completion of data mappings
  - Consolidation and formatting data prior to import
  - Accuracy of the data and the translation mappings provided
  - Providing reports requested to be used by Intuit to validate the data import
- Intuit resources are responsible for completing the data imports for the pilot and production conversions.
- The pilot data will discarded and re-imported during the production conversion
- Intuit resources are responsible for providing a high level validation of the data imported using the reports provided by the Client
- The pilot and production conversion will include the following data points:
  - Approximately 115 entities
  - 2 years general ledger history
  - 1 chart of accounts
  - 1 consolidated vendor list
- Residential data will be keyed into the MRI database via manual entry by client resources.
- Intuit resources will provide instruction to Client resources on the data entry process.
- The database setup instruction workshops will be as follows:
  - Global and master tables – two (2) days
  - Data entry – one (1) day
- Client personnel are responsible for validating the accuracy of data entered into MRI.

**Application Toolkit Modification/Customization Assumptions**

- This work authorization assumes the Client will use the standard product functionality. Application toolkit modification and/or customizations have not been included within this project scope.
- Should application toolkit modification and/or customization needs be identified, a project change request will be processed to increase the scope and budget of the project.

**Training Assumptions**

- Training is performed using a standard sample database that provides the necessary representative data so that critical features and functions can be efficiently and effectively trained.

Intuit Real Estate Solutions
Proprietary and Confidential



- Client may request a more personalized training database, including a copy of their production database; however there will be an incremental fee based on the agreed upon scope to prepare for delivery and update courseware material prior to the scheduled training.
- If Client requests a more personalized training database, Client shall be solely responsible to configure the training environment to ensure that the Intuit Software, training database, seating, networking of desktops, etc., have been completed prior to the start of training.
- Client may request a more personalized training program which differs from the standard outline and structure provided for review by Intuit; in such cases, there will be an incremental fee based on the agreed upon scope to redesign and update courseware material to reflect the customized needs.
- Any personalized training program requests which differ from Intuit's standard program delivery will be scoped at the time of request.
- If Client contracts with Intuit for access to a training environment:
  - Intuit will provide access to the training environment at least one (1) business day prior to the training event
  - Client will provide Intuit via email (IRES_Learning@intuit.com) with the number of logins needed and dates the logins will be used at least one (1) week in advance of the training event.
  - Intuit will terminate Client access upon completion of the training event.
  - For subscription clients, Intuit will restore all training environments on a predefined weekly schedule.
- Training classes conducted at Client's site or at a facility booked by Client are limited to a maximum of twelve (12) Client attendees, except for the Train the Trainer programs, which are limited to a maximum of eight (8) Client attendees.
- Custom virtual training prices include one computer log-on.  An additional $50 will be charged for each additional computer log-on needed.

**Access 24/7 Assumptions**

- The duration of the project is based on the assumption that the contract with an Intuit payment vendor has been finalized prior to the start of this project.  The Access 24/7 project duration is estimated to be six weeks.
- Client is responsible for completing the domain name/URL registration, and purchase of SSL certifications prior to the start of this project.
- The URL names for Access 24/7 will be Client domain names.
- Pilot properties will be re-directed to the live environment during the Launch phase once testing is complete.
- Resident date of birth and the last four digits of their social security numbers must be set up in RM Web in order for residents to set up an account in Resident Portal.  The client is responsible for ensuring this information is in the MRI RM Web system.
- Access 24/7 code requires that Property ID and Entity ID for each property be the same value once configuration of Access 24/7 begins.  It is the client's responsibility to ensure this configuration prior to the start of the Access 24/7 implementation.
- The implementation will include the setup and testing of one property on the resident portal and online payment functionality.
- The planning and immersion session will take place onsite at the client's home office location.
- The implementation will be based on MRI v4.0 and assumes the client will not perform a major upgrade for the duration of the implementation.  A time and cost estimate will be provided if a major upgrade becomes part of the project scope.
- Intuit will use a training database with sample data to deliver the application immersion training to Client team members.
- Solution Design documentation will be completed by Intuit resources.

Intuit Real Estate Solutions
Proprietary and Confidential



- Client resources will be responsible for the User Acceptance Testing plan and creation of test scripts to be used in the Inspect phase.
- Intuit will be responsible for the set up of one (1) pilot property.
- UAT will be completed in the client's test environment.
- The UAT period will not exceed one week.
- Intuit will be responsible for the set up of two (2) properties within the client's production database.
- Training classes will be completed remotely.

## Resource Assumptions

| Role | Description |
|------|-------------|
| Solution Consultant | • Provides industry and product subject matter expertise on an advisory level on the Intuit Solutions<br>• Provides instruction on the configuration of the Intuit applications |
| Technical Consultant | Provides technical application requirements documentation |
| Installation Consultant | • Installs and configures core Intuit applications and related SQL databases<br>• Provides architectural direction on system and application infrastructure |
| Conversion Specialist | • Responsible for the planning and conversion of data |

## Pricing Assumptions

- Intuit Real Estate Solutions fees for the scope of Services described in this Work Authorization:
  - Will be billed to the Client on a time and materials basis for Implementation Services per the pricing below.
  - Will be billed to the Client on a fixed fee basis for Learning Services per the pricing below.
- Change orders executed against this contract will be contracted at Intuit standard rates.
- Future work for either Implementation Services or Learning Services not associated with this work authorization will be contracted at standard rates.
- The cost estimates are for Intuit personnel only and will be billed on a monthly basis.
- Identified SCHEDULES may be modified at the request and/or acceptance of client. Changes in SCOPE will require PCR (see above).
- Fee estimates do not include travel and lodging expenses. Reasonable and necessary travel and related expenses (including transportation, hotels, meals, etc.) will be billed at the actual amounts incurred.
- Any travel expenses over $500 will be pre-approved in writing by the client prior to reservation confirmation.
- All travel expenses will be governed by Intuit's current Travel and Expense policy in accordance with the Agreement.
- Client is responsible for payment of any applicable taxes. Intuit will invoice Client for any applicable taxes in connection with performance of the Work Authorization in accordance with the Agreement. Any tax amounts are over and above the fees and expenses noted in the Work Authorization and any amounts prepaid hereunder for such fees and expenses will not be applied to taxes due.

**Page 5 of 6**

Intuit Real Estate Solutions
Proprietary and Confidential

**intuit**

❖ Pricing schedule is subject to change if work authorization is not signed within 30 days of creation date at which time this work authorization will expire.

**Pricing Schedule**

| Intuit Role | Effort | Discounted Blended Hourly Rate | Estimated Cost |
|---|---|---|---|
| Solution Consultant | 140 hours | $185 | $25,900 |
| Installation Consultant | 4 hours | $185 | $740 |
| Conversion Specialist | 48 hours | $185 | $8,880 |
| Technical Consultant | 8 hours | $185 | $1,480 |
| Residential Management Web End User training | N/A | N/A | $4,080 |
| Accounts Payable/General Ledger Windows End User training | N/A | N/A | $4,080 |
| TOTAL | 200 hours | | $45,160 |

9/29    31    KARYN
10/25   12:50  KARYN
10/25   1     MEL
12/5    4     BURSER
12/5    1     KARYN
12/12   24    KARYN
12/13   2.5   KARYN
12/12   12    MEL
12/18   8     MEL
12/26   4.5   KARYN
        4     C HOCKLEY
        3     C HOCKLEY
        8     C HOCKLEY
        24    MEL
1/23    1     C HOCKLEY
1/30    2     C HOCKLEY