United States District Court
District of Massachusetts

| | |
|---|---|
| SAMIA COMPANIES LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 11-12329-NMG |
| ) | |
| MRI SOFTWARE LLC, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM & ORDER**

GORTON, J.

This case arises out of an alleged breach of a July 2009 Master License & Services Agreement ("Agreement") between plaintiff Samia Companies LLC ("plaintiff" or "Samia") and defendant MRI Software LLC ("defendant" or "MRI"). Plaintiff is one of the largest real estate management firms in Boston, Massachusetts and defendant is a software company in the business of computer-based real estate management. MRI was formerly known as Intuit Real Estate Solutions ("Intuit").

Under the Agreement, plaintiff agreed to purchase computer software, consulting services and technical support services from the defendant. Samia alleges that MRI breached the Agreement, misrepresented the software components and capabilities, converted Samia's funds and conducted unfair or

deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A.

Three of the ten Counts in the complaint were dismissed after defendant filed a motion to dismiss.  Defendant now moves for summary judgment on all remaining counts.  For the reasons that follow, the motion will be allowed, in part, and denied, in part.

I. **Background**

   A. **The Agreement**

In July, 2009, Samia and Intuit entered into a Master License & Services Agreement.  The contract called for Intuit 1) to license and deliver to Samia a number of software programs for performing accounting and administrative functions in the real estate management business, 2) to provide professional consulting services during the implementation of the software, 3) to provide any software updates, or "Software Maintenance Services," for a period of one year and 4) to provide technical support services, or "Application and Technical Support," on an as-needed and pay-as-you-go basis.[1]

The Agreement contained a limited express warranty stating:

> [MRI] warrants that for a period of thirty (30) days (the "Warranty Period") following Delivery by [MRI] to Client, any Licensed Program...will conform in all

---

[1] As set forth in Schedule A to the Agreement, the software consisted of ten named Licensed Programs but none of them was specifically described.

> material respects with the applicable Documentation ("Warranty Criteria") provided to Client by [MRI]. In the event that Client determines that any Licensed Program...as delivered to Client by [MRI] fails to conform to the Warranty Criteria and Client delivers to [MRI] notice of such failure within the Warranty Period...[MRI] shall repair or replace the specific non-conformities as soon as practicable at no additional charge to the Client. The foregoing warranty states Client's sole and exclusive remedy...

The Agreement defines "Delivery" of the software to occur on the date that Intuit provides Samia with the Licensed Programs set forth in Schedule A in person, via common carrier or made available for Samia to download, whichever date is the earliest.

### B. Subsequent developments and alleged breach

Installation and implementation of Intuit's software programs onto Samia's computer system began in September, 2009. During that period, Samia requested that the software be capable of generating certain custom documents. The parties agreed that the request was outside the scope of the Agreement so Intuit drafted a proposed work authorization No. 27661 ("custom documents proposal") in October, 2009 to customize the software to perform Samia's desired functions.

In January, 2010, Intuit was acquired by investors and later was re-constituted as defendant MRI. Samia asserts that software development, installation and training on software components ceased during the transition period. It alleges that

communications with MRI became particularly frustrating and difficult because of personnel changes at MRI.

Nonetheless, Samia launched the new software in March, 2010. It then signed the custom documents proposal which was incorporated into the original Agreement. MRI completed work on the custom documents project the following month. Samia believed that the software had certain defects, however, and decided to hire an outside IT consultant, Chris Patten, to modify the customizations. In August, 2010, Samia informed MRI that the document-generating programs were fully functional and that based on what it had paid Mr. Patten for his services, Samia was only willing to pay one-half of the fees MRI had invoiced for its customization work.

Another source of friction between the parties related to the Tax Form 1099-INT, a document that Samia was required to provide to certain tenants for tax return purposes. At the outset of the installation process, Samia had noticed that the software was incapable of performing functions related to Form 1099-INT. Samia insisted that Intuit's sales representative had promised that the software could perform those functions and that it would not have licensed the software otherwise. Intuit denied making such a promise but sent Samia a proposed work authorization No. 27736 ("1099-INT functions proposal") in November, 2009 to do the 1099-INT customization work for $9,000.

Samia did not sign the 1099-INT functions proposal and contended that the work should be done for free because the Intuit sales representative had promised that functionality in the software.

The relationship between Samia and MRI continued to deteriorate and Samia began withholding payment on invoices for consulting services in order to leverage MRI to perform the 1099-INT customization without charge.

Samia then filed the instant case against MRI, alleging that MRI 1) failed to provide certain software components that were promised as part of the Agreement, 2) failed to complete the development of certain work required under the contract, 3) improperly terminated technical support for which Samia had paid and 4) sold Samia dysfunctional system components.

Since filing the lawsuit, Samia has continued to use MRI's software in its business but has done so without any technical support or software maintenance agreement with MRI.

## II. **Procedural History**

In November, 2011, Plaintiff filed its complaint in Suffolk Superior Court, asserting claims against defendant MRI for breach of contract (Counts I, III, V and VIII), negligent misrepresentation (Counts II, IV, VI and IX), conversion (Count VII) and unfair or deceptive acts or practices in violation of Mass Gen. Laws ch. 93A (Count X).

Defendant removed the case to this Court the following month and, in February, 2012, moved to dismiss all claims in the complaint. In September, 2012, Magistrate Judge Judith Dein entered a Report and Recommendation ("R&R") that the misrepresentation claims in Counts IV, VI and IX be dismissed but that MRI's motion otherwise be denied. After consideration of the defendant's objections, this Court accepted and adopted the R&R.

In July, 2014, defendant moved for summary judgment on all of the remaining claims in the plaintiff's complaint.

### III. **Motion for Summary Judgment**

Samia contends that MRI breached the Agreement by 1) failing to deliver on an implied promise that the software would perform the 1099-INT functions (Count I), 2) delivering software that had other alleged defects (Count VIII), 3) mishandling the "custom documents" services under Work Authorization 27661 (Count III) and 4) increasing the price for an annual prepaid technical support plan (Count V).

Samia also claims that MRI misapplied a September, 2010 payment from Samia and is therefore liable for conversion (Count VII) and that before the contract was signed, MRI negligently misrepresented the software's ability to perform the 1099-INT functions (Count II). Finally, Samia claims that MRI's actions violated Mass. Gen. L. ch. 93A (Count X).

A.  **Summary Judgment Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is appropriate if, after viewing the record in the non-moving

party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.

This case is governed by Massachusetts law, as agreed to by the parties in the Agreement's choice of law provision.

**B.   Breach of Agreement**

**1.   Non-conformities (Counts I and VIII)**

Two of Samia's claims involve allegations that MRI's software did not perform as required under the Agreement. Count I of the complaint asserts that defendant breached the Agreement by failing to deliver on an alleged promise that the software would perform the 1099-INT functions. Count VIII asserts that certain other software components were non-functioning or non-existent.

Defendant responds that under Article 2 of the Uniform Commercial Code, codified at M.G.L. c. 106 § 2-101 et seq., and the terms of the Agreement, plaintiff accepted the delivery of the software in September, 2009 and is therefore limited to the contractual remedies set forth in the Agreement. The Agreement explicitly provides for an express warranty that is limited both as to time (30 days after delivery) and scope (material conformance with documentation provided by MRI). Notices of non-conformities made within the 30-day period were to be repaired or replaced at no charge. That was the sole and

exclusive remedy under the contract and all other remedies were disclaimed. Because Samia failed to follow the procedure for invoking its warranty rights when it discovered that certain allegedly promised functions were missing or non-functional, MRI contends that it is precluded from seeking rescission damages.

Plaintiff counters that MRI did not, in fact, deliver the software and therefore the terms of the Agreement relating to notification of non-conformities were never implicated. It asserts that the failure to deliver the 1099-INT component in itself constitutes a breach of the Agreement.

Samia confuses the matter of delivery of goods and services with the question of whether they conformed to the Agreement. As a matter of law, goods and related services are "delivered," thus requiring acceptance or rejection, when they are tendered to the buyer, even if they allegedly fail to conform to contract specifications. See New England Power Co. v. Riley Stoker Corp., 20 Mass. App. Ct. 25, 29 (1985) (holding that the allegedly defective and non-conforming commercial boilers were delivered when they were shipped to and installed at the plaintiff's facility); Reed Tech. & Info. Servs., Inc. v. Future Vision Holding, Inc., 1998 WL 1181781, at *6 (Mass. Super. July 7, 1998) (concluding that software was delivered even though the issue of whether the software conformed to the contracted

specifications was in dispute). Goods do not have to conform fully to the parties' Agreement to be deemed "delivered."

Even assuming that the software provided by MRI contained deficiencies such as the inability to perform 1099-INT function, Samia cannot successfully contend non-delivery in September, 2009. If Samia discovered missing functions, it was contractually obligated to reject the software and halt the installation process upon discovering the non-conformities. See M.G.L. c. 106 § 2-602.

Furthermore, the Agreement explicitly provides a procedure for invoking warranty rights. Although Samia complained about the missing functions, it failed to give written notice to MRI detailing the specific non-conformities within 30 days of the date of software implementation. Even if it had, Samia's remedies would have been expressly limited to the repair or replacement of the non-conforming software. Such contractual limitations of warranty rights are entirely enforceable under Massachusetts law. See Teragram Corp. v. MarketWatch.com, Inc., 2004 WL 3086883 (D. Mass. Dec. 29, 2004) (granting summary judgment for a seller-licensor because the buyer failed to meet explicit conditions imposed in a software license agreement to receive limited warranty remedies).

The factual record of the events surrounding the purchase, installation, implementation and ongoing usage of the MRI

software also demonstrates that Samia accepted MRI's delivery of its product. Not only did Samia fail to reject the software, it has continued to use it for the past five years. Plaintiff cannot now claim that it was never delivered.

Having accepted MRI's delivery of allegedly non-conforming software without meeting the conditions for obtaining remedies under the Agreement, Samia is now barred from recovery as a matter of law. Accordingly, MRI is entitled to summary judgment on Counts I and VIII.

### 2. Deficiencies in services (Counts III and V)

#### i. Custom documents

Count III of the complaint alleges that MRI breached the Agreement by performing poor services under the custom documents work authorization. The Court perceives no such breach.

The Agreement contains a provision that explicitly addresses potential defects in services. With respect to any services performed under the Agreement, the contract specifically provides that Samia has 30 days after delivery to

> test any project elements...and notify [MRI] of all potential deficiencies relative to the applicable specifications for such work.

Upon such timely notification, MRI must "re-perform the applicable Consulting Services required to meet the specifications."

Samia, however, never notified MRI of any supposed deficiencies after receiving the software in April, 2010. Instead, it hired an outside IT consultant to customize the software's performance. In support of its claim, plaintiff proffers the argument that the required customizations were never "delivered" so as to implicate the provisions within the Agreement. The Court finds no genuine issue of material fact in this dispute. A claim of non-conforming services does not equate to a failure to deliver services. Defendant will not be held liable for plaintiff's failure to comply in accordance with the protocol specified within the Agreement and summary judgment with respect to Count III will be allowed.

### ii. Failure to provide technical support

Count V alleges that MRI breached the Agreement by increasing the price for its annual prepaid technical support plan. Samia initially elected a "bronze" plan, under which it would not pay an up-front fee and would receive support services on a pay-as-you-go basis. In March, 2010, the parties amended the Agreement to reflect Samia's decision to upgrade to a "silver" level support plan for the remainder of the first contract year. Samia paid a pro-rated, up-front fee for such services.

The Agreement provided that after the first year of support, MRI "reserves the right to increase the price for"

application and technical support services. The March, 2010 amendment specified that the Agreement provisions would not be waived or modified unless otherwise expressly provided and that the technical support plan would be "renew[ed] unless otherwise terminated by the Client."

Samia contends that by inserting the renewal language in the amendment, MRI gave up its earlier express right to increase the price for application and technical support after the first year of the Agreement. The Court disagrees. The record, viewed in the light most favorable to the plaintiff, does not indicate that the defendant voluntarily relinquished its contractual right to alter prices.

Defendant's motion for summary judgment will be allowed with respect to Count V of the plaintiff's complaint.

### C. Conversion (Count VII)

Samia asserts a claim for conversion on the grounds that MRI misapplied funds paid for a specific purpose. In September, 2010, it sent MRI a check for $12,018 with directions that it be applied to renew Samia's annual Software Maintenance Services agreement and the balance applied to renew the Application and Technical Support "silver" plan for another year at the March 2010 price. MRI renewed the Software Maintenance Services agreement for one year for $9,581.25 but did not renew the "silver" plan due to a disagreement with Samia regarding its

terms. Instead, MRI retained the balance on account for application against the $29,000 in invoices that remained unpaid.

A claim of conversion involves the intentional or wrongful exercise of ownership, control or dominion over personal property to which a defendant has not right of possession. Abington Nat'l Bank v. Ashwood Homes, Inc., 475 N.E.2d 1230, 1233 (Mass. App. Ct. 1985). Samia asserts that it was never provided with an accounting for the amount paid to MRI. However, it has failed to show that MRI had no right to retain it. The factual record instead indicates that Samia intentionally withheld payment on invoices and that MRI was owed an amount greater than that which was retained from that particular transaction.

Accordingly, defendant's motion for summary judgment with respect to Count VII will be allowed.

### D. Negligent misrepresentation (Count II)

In order to prevail on a claim for negligent misrepresentation, plaintiff must establish that 1) MRI supplied false information without reasonable care, 2) Samia justifiably relied on the information and 3) it suffered pecuniary loss caused by the justifiable reliance upon the information. Cumis Ins. Soc'y, 455 Mass. at 471-72. Plaintiff does not have to prove an intent to deceive and "under Massachusetts law

plaintiff[] need not prove that [defendant] knew his statements to be false." Nickerson v. Matco Tools Corp., Div. of Jacobs Mfg. Co., 813 F.2d 529, 530 (1st Cir. 1987).

Samia asserts that MRI negligently misrepresented the ability of the software to perform the 1099-INT functions. According to the plaintiff, Intuit's sales representative assured Samia that the software would contain the 1099-INT functions and even provided a product demonstration during which Samia was shown the 1099-INT component of the software program. Samia contends that it relied on the promise and would not have entered into the Agreement without such an assurance.

MRI denies that it made any such promise. It argues that even if such a representation was made, Samia cannot recover for negligent misrepresentation because the factual record indicates that it incurred no damages during the limited operative period. Plaintiff alleges that the misrepresentation about the 1099-INT functionality was made in or about June, 2009 and has acknowledged that it learned that the software did not contain such a component when the installation process began in September, 2009. Once Samia became aware that the software lacked the 1099-INT function, it was no longer relying on the alleged misrepresentation. MRI asserts that any recovery by Samia with respect to its negligent misrepresentation claim

would necessarily be limited to damages incurred between June and September, 2009, but that Samia has alleged no such damages.

The Court disagrees with the defendant's assessment. Massachusetts has adopted Section 552B of The Restatement (Second) Torts (1977) with respect to damages for negligent misrepresentation. Danca v. Taunton Sav. Bank, 385 Mass. 1, 9 (1982). Section 552B provides that:

> (1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including
>
> > (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
> >
> > (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

The Restatement (Second) Torts § 552B (1977). If Plaintiff successfully proves the first two elements of its negligent misrepresentation claim, it will be entitled to receive as damages the difference in value between a software program with 1099-INT functionality and the one it received. That may be measured by the expenditures Samia subsequently made to obtain a separate program offering 1099-INT capabilities.

The Court concludes that there remains a genuine issue of material fact as to whether the 1099-INT functions were orally

promised to Samia. Accordingly, defendant's motion for summary judgment will be denied with respect to Count II.

**E.    Violation of Mass. Gen. Laws ch. 93A (Count X)**

As Magistrate Judge Dien concluded in her September, 2012 R&R, "[a] breach of contract, standing alone, is not an unfair trade practice under c. 93A." Report and Recommendation at 33 (Docket No. 12) (quoting Zabin v. Picciotto, 73 Mass. App. Ct. 141, 169 (2008)). Instead, "a breach must be both knowing and intended to secure unbargained-for benefits to the detriment of the other party" and the breaching party's conduct must rise "to the level of commercial extortion or a similar degree of culpable conduct." Id. (quotations and citations omitted).

Although the complaint does not identify any particular conduct on the part of MRI that would meet this standard, the Court allowed Samia to conduct discovery to develop its factual basis for the Chapter 93A claim.

Samia asserts that it was useless to conduct such discovery because most of the individuals who worked with Samia were terminated when MRI purchased Intuit in January 2010. Plaintiff maintains that it nevertheless conducted an extensive information gathering effort and is prepared to present its case at trial. A promise to proffer evidence at trial is, however, inadequate to avoid summary judgment in these circumstances. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)

("Neither wishful thinking nor mere promises to produce admissible evidence at trial...will serve to defeat a properly focused [summary judgment] motion" (citations omitted)).

There is no evidence that MRI sought unbargained-for benefits, engaged in commercial extortion or acted in bad faith. Nevertheless, the Supreme Judicial Court of Massachusetts has held that for the purposes of summary judgment, claims for negligent misrepresentation and under Chapter 93A "stand or fall together, as negligent misrepresentation may be a sufficient basis for liability under G.L. c. 93A." DeWolfe v. Hingham Ctr., Ltd., 464 Mass. 795, n.9 (2013); see also Swanson v. Bankers Life Co., 389 Mass. 345, 349 (1983) ("recovery may be had for a deceptive act that is the result of a defendant's negligence.... But not every negligent act is unfair or deceptive and thus unlawful under G.L. c. 93A, § 2").

Because plaintiff's claim under negligent misrepresentation will survive summary judgment, defendant's motion for summary judgment with respect to Count X will also be denied.

## ORDER

For the foregoing reasons, defendant's motion for summary judgment (Docket No. 73) is **ALLOWED, in part**, and **DENIED, in part**. Claims I, III, V, VII and VIII asserted in the complaint filed on November 15, 2011 (Docket No. 1, Ex. 1) are **DISMISSED**.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated October 9, 2014